FILED
CLERKS OFFICE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

2005 FEB 15 P 1: 4!

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**Ex Rel**<br><br>**VEN-A-CARE OF THE<br>FLORIDA KEYS, INC.,**<br>a Florida Corporation,<br>by and through its principal<br>officers and directors,<br>**ZACHARY T. BENTLEY and<br>T. MARK JONES,**<br><br>Plaintiff,<br><br>v.<br><br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>████████████████<br>**DEY, INC.;**<br>████████████████<br>**EM PHARMA, INC.;**<br>**EMD PHARMACEUTICALS, INC.;**<br>████████████████ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CIVIL ACTION NO. 00 CV10698 MEL**<br><br>**FILED IN CAMERA AND<br>UNDER SEAL**<br><br><br><br>**THIRD AMENDED COMPLAINT** |

CIVIL ACTION NO. 00 CV10698 MEL



)
)
)
)
) **For Money Damages and Civil**
) **Penalties Under the False Claims**
) **Act 31 U.S.C. §§3729-3732**
)
)
)
)

LIPHA, S.A.;

MERCK-LIPHA, S.A.;
MERCK KGaA;

Defendants.

2

· CIVIL ACTION NO. 00 CV10698 MEL

### THIRD AMENDED COMPLAINT
**FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE
CLAIMS ACT 31 U.S.C. §§3729-3732**

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or
"GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-
CARE" or "the Relator"), and its principal officers and directors, ZACHARY T. BENTLEY
and T. MARK JONES, and by and through the undersigned attorneys on behalf of the
UNITED STATES and on the Relator's own behalf and brings this action against ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████DEY, INC.; ███████████████

███EM PHARMA, INC.; EMD PHARMACEUTICALS, INC.; ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

3

CIVIL ACTION NO. 00 CV10698 MEL



LIPHA, S.A ; MERCK-LIPHA, S.A.; MERCK KGaA;

, (sometimes referred to collectively as "DEFENDANTS"), for money damages and civil penalties arising out of the DEFENDANTS' violations of the Federal False Claims Act ("False Claims Act" or the "Act") 31 U.S.C., §§3729-3732.

### TABLE OF CONTENTS

|  |  | Page No: |
|---|---|---|
| **SECTION NO. 1** | | **11** |
| **SUMMARY OF THE ACTION** | | |
| **A.** | **THE DEFENDANTS' FRAUD PERTAINED TO TWO CATEGORIES OF PRESCRIPTION DRUGS: 1) DRUGS REIMBURSED SOLELY BY MEDICAID AND 2) DRUGS REIMBURSED BY BOTH MEDICAID AND PART B OF MEDICARE** | **15** |
| **B.** | **DRUG MANUFACTURERS' FALSE PRICE AND COST REPRESENTATIONS INVOLVING RETAIL PHARMACIES AND THE STATE MEDICAID PROGRAMS** | **16** |

CIVIL ACTION NO. 00 CV10698 MEL

## TABLE OF CONTENTS

C. DRUG MANUFACTURERS' FALSE PRICE AND COST REPRESENTATIONS INVOLVING PHYSICIANS AND PHARMACIES AND THE STATE MEDICAID PROGRAMS AS WELL AS MEDICARE — 19

■ ██████████████ — 20

E. DAMAGES CAUSED BY THE DEFENDANTS' FALSE CLAIMS SCHEMES — 22

SECTION NO. 2 — 24
THE PARTIES

SECTION NO. 3 — 46
JURISDICTION & VENUE

SECTION NO. 4 — 47
HOW DRUG MANUFACTURERS' PRICE AND COST REPRESENTATIONS ARE OBTAINED BY THE MEDICARE AND STATE MEDICAID PROGRAMS WHICH THEN UTILIZE THEM TO CALCULATE DRUG REIMBURSEMENT AMOUNTS

SECTION NO. 5 — 52
ROLE OF THE DRUG WHOLESALER

SECTION NO. 6 — 54
BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE MEDICARE PROGRAM

SECTION NO. 7 — 58
BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE STATES' MEDICAID PROGRAMS

A. FUNDING FOR MEDICAID — 58

CIVIL ACTION NO. 00 CV10698 MEL

## TABLE OF CONTENTS

|  |  | Page No: |
|---|---|---|
| **B.** | **MEDICAID PAYMENT OF CLAIMS FOR PRESCRIPTION DRUGS** | **60** |
| **SECTION NO. 8** | **BACKGROUND OF THE MEDICAID REBATE PROGRAM** | **65** |
| **SECTION NO. 9** | **THE FALSE CLAIMS SCHEMES** | **71** |
| **A.** | **DEFENDANTS' SCHEMES RESULTED IN MULTIPLE VIOLATIONS OF THE FALSE CLAIMS ACT** | **71** |
| **B.** | **THE NATURE AND IMPACT OF THE DEFENDANTS' FALSE CLAIM SCHEMES** | **79** |
| **SECTION NO. 10** | **THE DEFENDANT DRUG MANUFACTURERS' KNOWLEDGE OF THE FALSE CLAIMS SCHEMES** | **81** |
| **SECTION NO. 11** | **DAMAGES CAUSED BY DEFENDANTS' FRAUD SCHEMES** | **88** |
| **SECTION NO. 12** | **DEFENDANTS CONSPIRED TO DEFRAUD THE MEDICARE AND MEDICAID PROGRAMS** | **92** |
| ████████████████████████████ | | **96** |
| **SECTION NO. 14** | **THE DEFENDANTS HAVE REPEATEDLY UNDERMINED EFFORTS OF THE FEDERAL AND STATE GOVERNMENTS TO ENSURE THAT GOVERNMENT DRUG REIMBURSEMENT AMOUNTS ARE REASONABLE** | **101** |

CIVIL ACTION NO. 00 CV10698 MEL

## <u>TABLE OF CONTENTS</u>

|  | Page No: |
|---|---|
|  | **105** |
|  | **110** |
|  | **114** |
|  | **118** |
|  | **121** |
| **SECTION NO. 20**<br>**THE SPECIFIC FALSE PRICE AND COST**<br>**REPRESENTATIONS OF DEFENDANT**<br>**DEY AS TO MEDICARE AND MEDICAID** | **125** |
|  | **127** |
|  | **131** |

CIVIL ACTION NO. 00 CV10698 MEL

## TABLE OF CONTENTS



Page No:

135

141

143

147

152

155

159

162

CIVIL ACTION NO. 00 CV10698 MEL

## TABLE OF CONTENTS



Page No:

167

172

175

178

182

186

190

**SECTION NO. 38**
    **RECOVERY OF STATES' SHARES OF DAMAGES TO THE
    MEDICAID PROGRAM**                                                    193

CIVIL ACTION NO. 00 CV10698 MEL

## TABLE OF CONTENTS

**COUNT I**    **195**
FALSE CLAIMS ACT; CAUSING PRESENTATION OF
FALSE OR FRAUDULENT CLAIMS

**COUNT II**    **196**
FALSE CLAIMS ACT; CAUSING A FALSE RECORD
OR STATEMENT TO BE MADE OR USED TO GET A
FALSE OR FRAUDULENT CLAIM PAID OR APPROVED
BY THE GOVERNMENT

**COUNT III**    **197**
FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR
STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION TO
PAY MONEY TO THE GOVERNMENT

**COUNT IV**    **198**
FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR
FRAUDULENT CLAIMS; ILLEGAL REMUNERATION

**COUNT V**    **200**
FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR
FRAUDULENT CLAIMS; PROHIBITED REFERRALS, CLAIMS AND
COMPENSATION ARRANGEMENTS

**COUNT VI**    **202**
FALSE CLAIMS ACT; CONSPIRING TO DEFRAUD THE
GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM
ALLOWED OR PAID; J-CODE/PHYSICIAN SERVICES

**COUNT VII**    **204**
FALSE CLAIMS ACT; CONSPIRING TO DEFRAUD THE
GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM
ALLOWED OR PAID; HUB AND SPOKE CONSPIRACY

10

CIVIL ACTION NO. 00 CV10698 MEL

## TABLE OF CONTENTS

Page
No:



208

210

**COUNT X**     212
FALSE CLAIMS ACT; FALSE CLAIMS UNDER STATE LAW
ARISING FROM SAME TRANSACTION OR OCCURRENCE AS
BROUGHT IN THIS FALSE CLAIMS ACTION

**REQUESTS FOR RELIEF**     213

**DEMAND FOR JURY TRIAL**     218

### SECTION NO. 1
### SUMMARY OF THE ACTION

1.     This is an action for damages, treble damages, restitution, civil penalties, pre-

judgment interest and equitable relief, and for attorneys' fees and expenses of the Relator,

against the DEFENDANTS for violations of the False Claims Act as set out in Counts I

through X. The violations arise from DEFENDANTS' actions which caused Medicare and

the State Medicaid Programs to pay grossly inflated prices for DEFENDANTS' prescription

11

drugs. This Third Amended Complaint encompasses all the drugs identified in **Exhibits "1" and "2"** and those that may be added as amendments to this action in the future.

2.     The Medicare and State Medicaid Programs pay claims for the prescription drugs specified herein only if three distinct requirements are met. First, the pharmaceutical drug manufacturer must make price and cost information about the prescription drug available to price and cost publishing compendia, including First DataBank, Medi-span and Red Book. Second, the program must elect to cover the prescription drug when medically necessary. Third, the physician, pharmacy or other health care provider who purchases the prescription drug must confirm that it was administered or dispensed to an eligible person covered by the applicable program. In some cases, most notably that of the Texas Medicaid Program, pharmaceutical manufacturers must report costs and prices directly to the state program to satisfy the price disclosure requirement.

3.     This false claims action reveals an intentional scheme by DEFENDANTS to arrange financial inducements aimed at physicians (███████████████████████ █████████████████████████████████), clinics, ESRD Dialysis facilities and pharmacies to increase sales of DEFENDANTS' prescription drugs which are reimbursed by Medicare and the State Medicaid Programs (sometimes collectively referred to herein as "Medicare/Medicaid"). The particular prescription drugs at issue here are hereinafter referred to as the "specified drugs" and are listed in the attached **Exhibits "1" and "2"**. The DEFENDANTS reported or caused the reporting of false price and cost information to price publishing compendia, including Red Book, Medi-Span and First

12

CIVIL ACTION NO. 00 CV10698 MEL

DataBank, which resulted in the reporting of inflated Average Wholesale Price ("AWP"), Direct Price ("DP") and Wholesaler Acquisition Cost ("WAC") information to Medicare and the States' Medicaid Programs. The Defendants also reported such false price and cost information directly to State Medicaid Programs including that of Texas. The DEFENDANTS, participating in what amounts to a kickback scheme, created financial inducements by falsely inflating their reports of the price and cost information for the specified drugs and by offering concealed financial remuneration, in the form of free goods, discounts, direct monetary payments and rebates to customers, thus causing Medicare/Medicaid to pay inflated reimbursements to the DEFENDANTS' customers such as physicians, clinics, pharmacies and ESRD facilities. The DEFENDANTS' customers that submitted claims for reimbursement to Medicare and/or Medicaid for the specified drugs and provided the covered drug to the drug recipient are collectively referred to as "the Providers". The DEFENDANTS thus knowingly concealed from Medicare/Medicaid the prices generally and currently available in the marketplace and caused Medicare/Medicaid to use falsely inflated price reports when determining reimbursement amounts. The DEFENDANTS were fully aware of the Medicare and Medicaid reimbursement methodologies and knew that Medicare/Medicaid used the DEFENDANTS' reported drug prices and costs in establishing reimbursement amounts. Each DEFENDANT, had it so chosen, could have reported prices and costs for the specified drugs that were fairly and reasonably representative of the prices generally and currently available in the marketplace. The DEFENDANTS were also free to elect not to report

13

prices and thus not have their drugs covered by Medicare/Medicaid. Rather than choose either of these options, each of the DEFENDANTS has knowingly opted to report inflated prices and costs for the express purpose of creating an inflated spread between the resulting Medicare/Medicaid reimbursement amounts and the prices generally and currently available in the marketplace to Providers. The "Spread" is the difference between the purchase price and the amount reimbursed by Medicare/Medicaid. The inflated Spread caused Providers to purchase the specified drugs because it enabled them to receive inflated reimbursement amounts from the Medicaid and/or Medicare programs.

4.      The DEFENDANTS were fully aware that the Medicare and State Medicaid Programs were required by their reimbursement policies to use the drug prices and costs reported by the drug manufacturers, including the DEFENDANTS, in calculating reimbursement amounts.

5.      Additionally, some of the DEFENDANTS falsely identified their drugs to the federal government as non-innovator drugs for purposes of the Medicaid Rebate Program, when in truth they were innovator drugs. This deception enabled them to falsely pay a lesser rebate pursuant to the Medicaid Rebate Program, and thus defeated the purpose of that program, which was to permit the federal and state governments to receive the benefit of the drug manufacturers' lowest prices to commercial customers.

6.      Damages are determined based on the inflated reimbursement amounts and any appropriate adjustments due to make the United States whole as intended by the Medicaid Rebate Program.

14

CIVIL ACTION NO. 00 CV10698 MEL

7.    As a result of DEFENDANTS' fraudulent and illegal acts alleged herein, DEFENDANTS have substantially increased the expense to the taxpayer of the federal and state health programs and directly contributed to the soaring cost of providing prescription drugs for the nation's elderly and poor.

**A.    THE DEFENDANTS' FRAUD PERTAINED TO TWO CATEGORIES OF PRESCRIPTION DRUGS: 1) DRUGS REIMBURSED SOLELY BY MEDICAID; AND 2) DRUGS REIMBURSED BY BOTH MEDICAID AND MEDICARE**

8.    All fifty states have chosen to provide prescription drug coverage pursuant to Medicaid, the federal medical assistance program for the poor, which the federal and state governments jointly fund and which each state administers pursuant to federal statutes, regulations and guidelines. Additionally, the Medicare Program (which covers certain outpatient medical care for those over age 65, persons who are disabled and persons who have end stage renal disease), provides coverage for certain drugs which generally cannot be taken by mouth or self-administered and for a small number of oral drugs, including some chemotherapy and anti-emetic drugs.

9.    The drugs in this case are of two types:  those that are reimbursed only by the State Medicaid Programs and those that are reimbursed by both the State Medicaid Programs and by the Medicare Program. The first type, "specified retail pharmacy drugs," are virtually all taken orally or self-administered through a hand-held inhaler and are typically dispensed by retail pharmacies. The second type, hereinafter sometimes referred to as the "specified Medicare/Medicaid drugs", are reimbursed by both the State Medicaid Programs and by Medicare.  These drugs are typically prescribed for the treatment of

15

CIVIL ACTION NO. 00 CV10698 MEL

illnesses such as respiratory diseases, ████████████████████████████████.

They are generally available only through a hospital, physician, dialysis facility or

pharmacy. ████████████████████████████████████████████

████████████████████████████. The other specified Medicare/Medicaid

drugs at issue include, but are not limited to, ████████████████████████and

drugs used for inhalation therapy.

      10.    The pricing fraud allegations of this action pertain only to the

Medicare/Medicaid reimbursement for the ingredient costs of the prescription drugs at

issue herein and not to reimbursement for the administering or dispensing such drugs.

Medicare and Medicaid reimbursement for ingredient costs is separate and distinct from

reimbursement for administering or dispensing the drugs and involves separate payments

and different methodologies.

### B.    DRUG MANUFACTURERS' FALSE PRICE AND COST REPRESENTATIONS INVOLVING RETAIL PHARMACIES AND THE STATE MEDICAID PROGRAMS

      11.    The DEFENDANTS falsely represented the prices that they charged

wholesalers and/or the prices paid by Providers for the specified retail pharmacy drugs in

order to cause State Medicaid Programs to pay claims in excessive amounts. All State

Medicaid Programs are funded jointly by the United States and the states, with the United

States paying at least 50% of the cost of each state's program. The State Medicaid

Programs are required to pay drug reimbursement claims in amounts that do not exceed

16

CIVIL ACTION NO. 00 CV10698 MEL

the drug's Estimated Acquisition Cost ("EAC") to the pharmacy submitting the claim. 42 CFR §447.331. The DEFENDANTS knew that each of the States' Medicaid Programs had implemented a mechanism to estimate the acquisition cost of prescription drugs to a pharmacy. Most states (hereinafter sometimes referred to as "AWP STATES") based their estimates on the DEFENDANTS' representation of the AWP of their drugs. Some States based their estimate on the DEFENDANTS' representation of the prices they charged wholesalers for the specified drugs, sometimes referred to as "WAC," or as "price to wholesaler." Some States based their estimates on the DEFENDANTS' representations of their prices they charged Providers directly for the Specified Drugs sometimes referred to as "DP" or direct price. Attached as **Composite Exhibit "3"** is a chart showing the reimbursement methodologies used by each state from 1994 - 2004. In the case of the Specified Retail Pharmacy Drugs, the DEFENDANTS falsely inflated their reports of the drug prices and costs with the hope that Medicaid pharmacy Providers would be paid excessive amounts and thus choose their specified retail pharmacy drugs over competing brand and generic versions. The DEFENDANTS' false price representations were made directly to the States by the DEFENDANTS and through one or more of several recognized drug price publishing compendia including First DataBank, Medical Economics and Medi-Span. Those publications assemble drug price data, which the State Medicaid Programs use to establish reimbursement amounts.

12.    For many of their drugs, the DEFENDANTS reported prices and costs that were based upon a fair and reasonable review of their business records and other

17

information available to them, and the States' Medicaid Programs were thus able to accurately estimate acquisition costs when paying claims for those drugs.

13.    The DEFENDANTS caused the States to estimate and use inflated acquisition costs for reimbursement purposes and thus caused an inflated spread between the reimbursement set and the prices generally and currently available to Providers. The inflated Spread directly benefitted the DEFENDANTS, because it provided an incentive for Providers to order the DEFENDANTS' Specified Drugs instead of their competitors' drugs. The DEFENDANTS thus duped the State Medicaid Programs into paying claims for the specified drugs at inflated amounts in an effort to maintain and increase the DEFENDANTS' sales.

14.    The DEFENDANTS' wrongful exploitation of the State Medicaid Programs caused the UNITED STATES and the State Medicaid Programs to incur single damages in excess of Ten Million Dollars. The UNITED STATES and the States' Medicaid Programs are entitled to recover three times their damages plus up to Eleven Thousand Dollars per false claim, together with interest, costs and attorneys' fees.

CIVIL ACTION NO. 00 CV10698 MEL

C.  **DRUG MANUFACTURERS' FALSE PRICE AND COST
REPRESENTATIONS INVOLVING PHYSICIANS
AND PHARMACIES AND THE STATE MEDICAID PROGRAMS
AS WELL AS MEDICARE**

15.  The DEFENDANTS reported false prices and costs for the  specified

Medicare/Medicaid drugs: to Medicare Carriers and Durable Medical Equipment Regional

Carriers ("DMERC's") who approve and pay Medicare claims; to the States' Medicaid

Pharmacy Programs which approve and pay the  States' Medicaid claims; and to

Medicare/Medicaid through recognized publishing compendia including First Data Bank,

Medical Economics, and Medi-Span. The DEFENDANTS knew that the Medicare and

States' Medicaid Programs intended to base their payments of "reimbursement" for the

specified Medicare/Medicaid drugs on reasonable estimations of acquisition cost. Just as

in the case of the specified retail pharmacy drugs, the Medicare and Medicaid Programs

utilized the prices reported by the DEFENDANTS in estimating acquisition costs for the

specified Medicare/Medicaid drugs. The DEFENDANTS marketed their specified

Medicare/Medicaid drugs to Providers such as oncologists and infectious disease

physicians, clinics and pharmacies (including the Relator) through financial inducements.

The financial inducements included, but were not limited to, inflated spreads, which the

DEFENDANTS created by reporting false, inflated prices and costs for the drugs. The

DEFENDANTS were in a position to mislead the Medicare and Medicaid Programs with

their false price and cost figures for the specified Medicare/Medicaid drugs because the

DEFENDANTS typically reported prices generally and currently available in the

marketplace for their other drugs that are not the subject of this action.  The

19

CIVIL ACTION NO. 00 CV10698 MEL

DEFENDANTS thus wrongfully exploited the Medicare and States' Medicaid Programs by causing them to pay Providers grossly inflated amounts that far exceeded a reasonable reimbursement amount based on an estimation of costs.  This wrongful exploitation by DEFENDANTS caused the United States and the States' Medicaid Programs  to incur single damages in excess of Ten Million Dollars.  The UNITED STATES and the States' Medicaid Programs are entitled to recover three times their damages plus up to Eleven Thousand Dollars per false claim, together with interest, costs and attorneys' fees.



20

CIVIL ACTION NO. 00 CV10698 MEL



CIVIL ACTION NO. 00 CV10698 MEL



**E.    DAMAGES CAUSED BY THE DEFENDANTS' FALSE CLAIMS SCHEMES**

20.    The DEFENDANTS are liable for damages based on the amounts by which they caused inflated Medicare and Medicaid reimbursements through their false price representations that did not fairly and reasonably represent the prices generally and currently available in the marketplace. In addition, the DEFENDANTS are liable for damages based on the amounts by which their false representations enabled them to decrease or avoid their monetary obligations under the Medicaid Rebate Program.

21.    The calculation of damages arising from the DEFENDANTS' false price representations and false representations that drugs were non-innovators must further

22

take into consideration the rebates paid by the DEFENDANTS to the States under the Medicaid Rebate Program. To the extent any DEFENDANT underpaid a rebate that it owed for any of the specified drugs, or for other drugs sold with any of the specified drugs through bundling agreements, the DEFENDANTS' underpayments to the Medicaid Rebate Program will increase total damages.

22.    The total amount of damages for which the DEFENDANTS are liable includes the damages incurred by the United States Government alleged herein, as well as damages incurred by each of the States' Medicaid Programs arising from the same transactions and occurrences, recoverable under the States' laws as contemplated by 31 U.S.C. § 3732(b), and recoverable by the United States on behalf of the States pursuant to such federal laws as may be applicable.

23.    Damages incurred by the United States as a result of the DEFENDANTS' fraud on the Medicaid Program further include, but are not necessarily limited to, the amount by which the United States paid more to fund its share of each State's Medicaid Program than would have been required to pay, but for:

a.    The States' payments of inflated drug reimbursement amounts due to the DEFENDANTS' false representations of price and cost information about the specified drugs; and

b.    The States' collections from the DEFENDANTS of less than the amounts of quarterly Medicaid Rebates prescribed by law, as a result of those DEFENDANTS' false representations that drugs were non-innovator drugs and/or of those

23

CIVIL ACTION NO. 00 CV10698 MEL

DEFENDANTS' false representations of pricing information of the specified drugs or drugs sold with any of the specified drugs through bundling agreements, required under the Medicaid Rebate Program.

24.    Damages incurred by the United States as a result of the DEFENDANTS' fraud on the Medicare Program further include, but are not necessarily limited to, the total of the amounts by which payments of United States funds to the Medicare Carriers and ESRD Medicare claims contractors exceeded the amount that such payments would have been, but for the Carriers' payments of inflated drug reimbursement amounts due to the DEFENDANTS' false representations of price and cost information about the specified drugs.

### SECTION NO. 2
### THE PARTIES

25.    The Plaintiff in this action is the UNITED STATES. At all times material to this civil action, the United States Department of Health and Human Services ("HHS"), the Health Care Financing Administration ("HCFA") and its successor agency the Centers for Medicare and Medicaid Services ("CMS"), and The Bureau of Program Operations ("B.P.O.") were agencies and instrumentalities of the UNITED STATES, and their activities, operations and contracts in administering the Medicare and Medicaid programs were paid from UNITED STATES' funds. The UNITED STATES and its subcontractors performing on behalf of the UNITED STATES provided Medicare benefits to qualified beneficiaries, which included payment of claims for the prescription drugs specified herein manufactured

24

CIVIL ACTION NO. 00 CV10698 MEL

by the DEFENDANTS, and utilized the false and fraudulent price and cost representations made by the DEFENDANTS in approving and paying claims.

26.     The States, United States Territories, and the District of Columbia provided Medicaid benefits to qualified recipients, which included payment of claims for the prescription drugs specified herein manufactured by the DEFENDANTS, and utilized the false and fraudulent price and cost representations made by the DEFENDANTS in approving and paying claims. A significant percentage (at least 50%) of said Medicaid reimbursement was paid from United States Government funds pursuant to 42 U.S.C. § 1396b.

27.     The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator's principal officers and directors during the time relevant to this action include Zachary T. Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida. The Relator is a pharmacy and is licensed to provide prescription drugs specified in this Third Amended Complaint and has, during at least part of the relevant period of this Complaint, provided drugs reimbursed by Medicare and Florida Medicaid.

28.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

25

CIVIL ACTION NO. 00 CV10698 MEL

## PAGES 26 THROUGH 29

which includes the end of paragraph 28 through paragraph 32

have been completely

# REDACTED

CIVIL ACTION NO. 00 CV10698 MEL



33.

34.    The DEFENDANT, DEY, INC., is a corporation organized under the laws of Delaware with its principal offices in Napa, California.  DEY, INC. is the general partner of DEY, L.P., a limited partnership organized and existing under the laws of the State of Delaware.  EM PHARMA, INC., a division of DEY, INC., is organized under the laws of Delaware also with principal offices in Napa, California.  At all times material hereto, all acts committed by or on behalf of DEY, INC. were also committed by or on behalf DEY, L.P., a limited partnership.  DEY, INC. and DEY L.P. are referred to herein collectively as "DEY".  At all times material to this civil action, DEY has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly, distributing, or selling through wholesalers its drugs, including those identified in this

Complaint, to purchasers within the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and Medicare beneficiaries and for which claims would be paid from Medicare and Medicaid funds.    The DEFENDANT EMD PHARMACEUTICALS, INC. ("EMD") is a corporation whose headquarters are located in Durham, North Carolina. EMD is the sole shareholder of DEY. DEFENDANT LIPHA, S.A. ("LIPHA") is a corporation based in Lyon, France. LIPHA is the sole shareholder of EMD. DEFENDANT MERCK-LIPHA, S.A. ("MERCK-LIPHA") is a corporation based in Lyon, France. MERCK-LIPHA is the sole shareholder of LIPHA. DEFENDANT MERCK KGaA ("MERCK") is a German company based in Darmstadt, Germany. MERCK is the sole shareholder of MERCK-LIPHA. To the extent the acts of DEY at issue herein were performed by or otherwise attributable to EMD, LIPHA, MERCK-LIPHA or MERCK, or to any subsidiary or affiliate of any of these four defendants, then judgment should be entered against EMD, LIPHA, MERCK-LIPHA or MERCK where appropriate. At all times material hereto, the senior management and officers of EMD, LIPHA, MERCK and MERCK-LIPHA had knowledge of the false price and cost representations of DEY and possessed the managerial ability and duty to intervene and cause DEY to cease making the false price and cost representations. However, rather than take such action, the senior management and officers EMD, LIPHA, MERCK and/or MERCK-LIPHA permitted and encouraged DEY to continue making its false representations in order to increase the economic benefit of the ownership interests in DEY of EMD, LIPHA, MERCK and MERCK-LIPHA. MERCK was aware of the acts of its subsidiaries described herein including DEY and EM PHARMA,

31

CIVIL ACTION NO. 00 CV10698 MEL

both run by Charles Rice.  For example, when EM PHARMA raised the AWP on or about

May 1998 on Euthyrox, Mr. Rice informed MERCK.  In a Sales Commentary dated May 1,

1998 addressing the reasons for increasing the AWP, Mr. Rice explained to MERCK that

the AWP increase will not impact the selling price but will increase the Spread and

therefore assist in the marketing of Euthyrox:

> In May we will revise our AWP [on Euthyrox] to improve our position relative
> to the competition and communicate this to customers through new price
> lists.  This could result in helping Euthyrox displace existing substitution
> generic business, which will help sales in the short term.  This does not
> impact the selling price on our margins.

DL 82805-06

35.

32

CIVIL ACTION NO. 00 CV10698 MEL

# PAGES 33 THROUGH 44

## WHICH INCLUDES PARAGRAPHS 36 - 52

## HAVE BEEN COMPLETELY REDACTED

CIVIL ACTION NO. 00 CV10698 MEL



53.

54.    Any and all acts alleged herein to have been committed by any or all of the DEFENDANTS were committed by each DEFENDANT'S parents, affiliates, subsidiaries, officers, directors, employees, or agents who at all times acted on behalf of their respective DEFENDANT.

45

CIVIL ACTION NO. 00 CV10698 MEL

## SECTION NO. 3
## JURISDICTION & VENUE

55.    Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. §3729-32, specifically 31 U.S.C. §3730, and also 28 U.S.C. §§1331, 1345.

56.    Jurisdiction over claims under State law for the recovery of funds paid by a state or local government arising from the same transaction or occurrence, as this False Claims Act case, is founded upon the Federal False Claims Act, 31 USC 93732(b).

57.    Venue in the District of Massachusetts is appropriate under 31 U.S.C. §3732(a). Sufficient contacts exist for jurisdiction and venue in this District in that each of the DEFENDANTS transacted business in the District of Massachusetts by selling directly, distributing or selling through wholesalers their prescription drugs, including those identified in this Complaint, in the District of Massachusetts, knowing that those drugs would be supplied to Medicare beneficiaries and Medicaid recipients in the District of Massachusetts and that claims for reimbursement with respect to the specified drugs would be made by Medicaid and Medicare Providers.

58.    The Relator has standing to bring and has brought this action on behalf of itself and the United States pursuant to the provisions of 31 U.S.C. §3730.

46

CIVIL ACTION NO. 00 CV10698 MEL

### SECTION NO. 4
### HOW DRUG MANUFACTURERS' PRICE AND COST
### REPRESENTATIONS ARE OBTAINED BY THE MEDICARE AND
### STATE MEDICAID PROGRAMS WHICH THEN UTILIZE THEM TO
### CALCULATE DRUG REIMBURSEMENT AMOUNTS

59.    Prescription drug manufacturers, including the DEFENDANTS, and the

Medicare and Medicaid Programs, drug price and cost publishing services, hospitals,

pharmacies, physicians, wholesalers, private third party payors and administrators (e.g.,

insurance companies), governmental health benefit plans (e.g., federal and state employee

plans) and others involved in the health care industry communicate about drug prices and

costs by describing prices and costs with terms such as:

        a)    AWP

        b)    WAC

        c)    List Price

        d)    DP

        e)    Wholesale Net Price

60.    AWP is the drug price most commonly utilized by the healthcare industry and

by third party payors, including the Medicare and State Medicaid Programs, to calculate

the reimbursement amount for a given drug.

61.    During the time period covered by this Complaint, Medicare based its

reimbursement for prescription drugs on the reported AWP of each drug, as represented

by the manufacturer.

47

62.    The States' Medicaid programs, as required by 42 CFR §§447.331 and 447.332, reimburse Providers for drugs at the lower of: (1) Estimated Acquisition Cost ("EAC") plus a reasonable dispensing fee; (2) provider's Usual and Customary charges; (3) Federal Upper Limit(if applicable); and (4) State Maximum Allowable Charge (if applicable). CMS, which must approve all State reimbursement plans for prescription drugs, has approved approximately 48 states' plans (plus that of Washington, D.C.) whose methodology for arriving at the provider's EAC includes discounting a percentage off the reported AWP prices. This discounting ranges from AWP minus 5% to AWP minus 40%. Texas uses price representations obtained directly from drug manufacturers. Some states' formulas are WAC plus a percentage or an AWP discount/WAC hybrid. Some states, such as Texas and California, also consider the manufacturer's reports of DP in setting reimbursement.

63.    Medical Economics, Inc., the Hearst Corporation (First Data Bank) and Medi-Span are nationally recognized companies that specialize in gathering drug pricing and cost information, including AWP, WAC and DP.

64.    Medical Economics, Inc. annually publishes a book entitled *Drug Topics Red Book*, (along with periodic addendums to that book), which expresses drug prices and costs in terms of AWP. Medical Economics, Inc. also publishes a monthly update that contains current packaging and pricing data expressed in terms of AWP on the most widely prescribed drugs in the United States, together with any updated prices, expressed in terms of AWP, for new products.

48

CIVIL ACTION NO. 00 CV10698 MEL

65.    The Relator's information provided to the Government reveals that approximately 90% of all Medicare Carriers contracted by CMS to process Medicare Part B reimbursement claims use the AWPs, as represented in Medical Economics annual *Drug Topics Red Book* publication and the *Red Book* monthly updates, in determining the reimbursement amounts for Medicare prescription drug claims.

66.    Additionally, the DEFENDANTS regularly make representations of false price and cost information directly to the Carriers.

67.    The Hearst Corporation, through its First DataBank Division, published annually until 1997 a book titled *the First DataBank Blue Book* that expressed drug prices and costs in terms of AWP, Suggested Retail Price ("SRP") and Direct Price. Throughout the relevant time period First DataBank (sometimes referred to herein as "FDB") has also offered an automated database service through which the DEFENDANTS reported their representations in the form of AWP, Direct Price and Wholesale Net/WAC.

68.    First DataBank's automated service provides drug prices and costs for approximately 60,000 national drug code numbers ("NDC" numbers), comprising different drugs, sizes and strengths expressed in terms of AWP, Wholesale Net and Direct Price. First DataBank, at least on an annual basis, verifies data directly with each drug manufacturer. Each drug manufacturer, including each DEFENDANT, filled out, at the request of First DataBank, a "National Drug Data File Product Update Report" including pricing information such as WAC (Wholesale Net), Direct Price ("DP"), and AWP. The Relator's investigation has determined that more than 90% of the States' Medicaid

49

CIVIL ACTION NO. 00 CV10698 MEL

Pharmacy Programs have utilized the AWPs, DPs and WACs as reported by First DataBank through either the Blue Book or First DataBank's automated services in determining reimbursement amounts for Medicaid prescription drug claims.

69.     Medi-Span provides drug prices and costs for approximately 60,000 NDC numbers comprising different drugs, sizes and strengths through an electronic or automated service expressed in terms of AWP, Direct Price and WAC. The Relator's investigation has determined that at least one state has at times used Medi-Span's automated service in determining reimbursement amounts. Medi-Span was acquired by the Hearst Corporation/First DataBank in January 1998 and was subsequently divested to Lippincott, Williams & Wilkins, a subsidiary of Wolters Kluwer, in January, 2002. From the beginning of 1998 through 200·, therefore, First DataBank included Medi-Span. Medi-Span's reported drug prices are the same as or similar to the prices reported by First DataBank. Any variance between the prices reported by the two companies is minimal.

70.     In determining the drug pricing data which they report, First DataBank, Medical Economics and Medi-Span all receive and rely upon the price and cost representations of the respective drug manufacturers, including the DEFENDANTS.

71.     The drug manufacturers made or cause to be made price reports including representations of AWP that were ultimately reported by First DataBank, Medical Economics and Medi-Span.

72.     The Relator's investigation has determined that drug manufacturers, including the DEFENDANTS, provided First DataBank, Medical Economics and Medi-Span with the

50

specific prices and costs of their drugs along with instructions, if necessary, which allowed the price publishing companies to report the drug manufacturers' pricing information. This pricing information was then reported to and utilized by Medicare, Medicaid and others in determining reimbursements for prescription drugs. The drug manufacturers were aware their pricing information was reported to Medicare, Medicaid and others.

73.    During the relevant time period of this Complaint, a form entitled "New Product Submission Form" was provided by First DataBank to drug manufacturers to transmit information, including their prices, to First DataBank. A copy of this form is attached hereto as **EXHIBIT "4"**. The form permitted drug manufacturers to submit prices expressed in terms of Wholesale (Distributor) Price, Direct Price and AWP Price. After causing new products to be added to a national drug data formulary maintained by First DataBank, drug manufacturers, including DEFENDANTS, thereafter reported additional updated price representations and verifications of their price representations, including Wholesale Net Price, Direct Price and AWP Price to First Databank.

74.    During the relevant time period of this Complaint, forms titled "Product Listing Verification" and "New Product Information Form" were provided by Medical Economics/*Red Book* to drug manufacturers to transmit information, including their prices, to Medical Economics/*Red Book*. The forms permitted drug manufacturers to submit prices expressed in terms that include, but are not necessarily limited to, AWP. Drug manufacturers, including DEFENDANTS, provided updated price and cost representations

51

CIVIL ACTION NO. 00 CV10698 MEL

to Medical Economics Red Book expressed in terms that include, but are not necessarily limited to, AWP.

75.    Each of the DEFENDANTS was the source of the price and cost information reported by First DataBank, Medical Economics and MediSpan to the Medicare and States' Medicaid Programs at all times at issue in this action.    The Relator provided to the Government its information about the DEFENDANTS' false reporting of their price data to these publishers, including specific identification of representatives of First DataBank and Medical Economics to whom such information was reported. Thereafter, the Government conducted an investigation which confirmed the information supplied by the Relator, including the false information that each of the DEFENDANTS repeatedly and systemically communicated to First DataBank, Medical Economics and Medi-Span with the express purpose and effect of causing First DataBank, Medical Economics and Medi-Span to report falsely inflated prices and costs of the specified drugs in amounts set by the DEFENDANTS.

76.    The DEFENDANTS also regularly made direct representations of false price and cost information directly to the various state Medicaid agencies.

### SECTION NO. 5
### ROLE OF THE DRUG WHOLESALER

77.    The majority of the DEFENDANTS' drugs, including the specified drugs at issue in this action, are distributed through drug wholesalers who resell and distribute the drugs to hospitals, pharmacies, physicians and clinics.

52

. CIVIL ACTION NO. 00 CV10698 MEL

78.    Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source have comprised approximately eighty (80%) of the over $70 billion dollar annual U.S. wholesale drug market during the relevant time period of the Complaint. On August 29, 2001, Bergen Brunswig and AmeriSource merged to form AmeriSource Bergen Corporation. Wholesalers generally sell to any health care provider (such as pharmacies, physicians and clinics) who can lawfully dispense or administer prescription drugs.

79.    Throughout the time period covered by this Complaint, each DEFENDANT closely monitored and was aware of the prices it charged wholesalers for its drugs, including the specified drugs, and the impact which rebates, charge-backs, discounts and any other factors had upon the prices of the drug to wholesalers and Providers.

80.    Throughout the time period covered by this Complaint, each DEFENDANT also closely monitored and was aware of the prices which wholesalers charged Providers for its drugs and the net impact which rebates, volume discounts and any other off-invoice discounts had upon the prices to the Provider.

81.    The DEFENDANTS' "charge-back" arrangements with wholesalers were used to conceal from Medicare/Medicaid prices generally and currently available in the marketplace and to facilitate reports of inflated prices. In the charge-back arrangements at issue here, the drug manufacturer directly negotiated with entities for the sale of drugs at negotiated contract prices, with the knowledge that such contract prices would be significantly less than the reported wholesale prices. These customers contracted directly with the drug manufacturer for favorable prices, but, nevertheless received the drugs from

53

CIVIL ACTION NO. 00 CV10698 MEL

wholesalers. The wholesaler routinely received manufacturer invoices stating prices significantly higher than the actual cost of the drug to the wholesaler and significantly higher than what the wholesaler actually charged its customer under the charge back arrangement.

82.    The DEFENDANTS negotiated prices for their prescription drugs individually with hospitals, Government entities, closed pharmacies, mail order pharmacies, HMO's, physicians, and group purchasing organizations ("GPOs"). GPOs are comprised of smaller Providers such as pharmacies and often are managed by wholesalers. GPOs provide members with negotiated prices for specific drugs from manufacturers. The GPO member is able to purchase the drugs at the negotiated price, in some cases directly from the manufacturer and in others, from a wholesaler that has a charge-back agreement with the specific manufacturer. Numerous wholesalers have participated to some degree in the DEFENDANTS' charge-back system.

### SECTION NO. 6
### BACKGROUND OF HOW UNITED STATES' MONIES
### ARE PAID FOR DRUG CLAIMS UNDER
### THE MEDICARE PROGRAM

83.    HHS, through CMS, provides health insurance benefits to aged and disabled Americans pursuant to the provisions of the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq.

54

84.     The Medicare program provides covered health care benefits to certain targeted populations such as those persons who are over age 65, persons who are disabled, and persons who have end stage renal disease.

85.     The Medicare program is divided into two distinct parts: (A) Medicare Part A (Hospital Insurance for the Aged and Disabled) which covers services and goods furnished by hospitals, home health agencies, hospices, and skilled nursing facilities; and (B) Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) which covers physician services and a range of other noninstitutional services, such as durable medical equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and certain limited drug products and supplies.

86.     Medicare Part B pays a limited benefit for drugs that are provided:  (a) incident to a physician's services and typically cannot be self-administered; or (b) in conjunction with a medically necessary infusion pump, nebulizer or other DME device payable under Medicare's DME benefit.  Because this limited drug benefit is provided on an "incident to a physician's service" basis, or in conjunction with the medical necessity of a DME device, Congress' statutes and the corresponding HHS regulations and CMS policies have sought to limit Medicare's payments for claims for the drugs at issue to a reasonable amount based upon the cost of the drug.  This is due, in part, to the fact that the Medicare program pays additional amounts for the physician's professional fees, home health care services and the covered DME equipment.  The inflated reimbursement amounts on covered drugs caused by the DEFENDANTS' false price and cost

55

representations have thwarted the fundamental requirements of the Medicare and States' Medicaid Programs that reimbursement payments for the specified drugs be limited to reasonable amounts to cover the cost of the drugs.

87.    CMS administers the Medicare program. CMS awards cost-reimbursement contracts to private companies to evaluate and to process Medicare beneficiaries' claims for payment. Under Part A, CMS refers to contractors as "intermediaries." Under Part B, CMS refers to contractors as "carriers" and durable medical equipment regional carriers ( "DMERCs"). Under Part B, CMS pays the carriers and the DMERCs to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the Providers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. 42 U.S.C. §1395u.

88.    The Medicare Program pays eighty percent (80%) of the "reasonable cost" of drugs covered under Part B pharmaceutical claims from federal funds with the balance paid by the beneficiary. The Medicare Program reimbursed claims for Part B covered drugs based on the reported AWP of those drugs.

89.    During at least part of the period of time covered by this action, Medicare paid claims for Part B covered drugs categorized as multiple source drugs based on an analysis of an array of reported AWPs for those multiple source drugs. At times, the array may have included the reported AWP for the "brand" or therapeutically equivalent single source drug originally placed on the market. The analysis of the array to establish the

56

reimbursement for multiple source drugs is hereinafter referred to as the "J-Code Medicare Reimbursement Methodology."

90.    Part B drug claims are submitted either in hard copy form or through an electronic claims filing procedure.

91.    Providers submit claims for payment to the Medicare Program for the specified drugs at issue in this case using HCFA's Common Procedure Coding System ("HCPCS" or the "J Code System"). The HCPC system for pharmaceuticals is a 5 digit alphanumeric code, such as ▮▮▮▮▮▮, 50 mg.; HCPCS Code ▮▮▮▮.

92.    HCFA requires all Part B Carriers and the DMERCs to report to HCFA Central quarterly claims activity, by HCPCS Code, for all drugs submitted by Providers for reimbursement by the Medicare Program.

93.    Beneficiaries' claims are processed by the carriers as either "assigned" (those claims for which payment is made directly to the Provider) or "unassigned" (those claims for which payment is made directly to the beneficiaries).

94.    All or nearly all drug claims for the charges at issue are assigned.

95.    During the early 90's the Medicare Carriers attempted to survey physicians' actual invoice prices paid for drugs, to comply with the regulation (42 CFR §405.517) but were stopped by a complaint filed by the American Society of Clinical Oncologists ("ASCO") with the Executive Office of Management and Budget, asserting that the Paperwork Reduction Act had been violated. A subsequent effort by CMS to design a new survey to determine physicians' actual invoice costs was also stopped by ASCO. ASCO

complained that the actual prices being paid were discounts and confidential in nature and that the survey had other flaws.

96.    At all times at issue in this case, the Medicare program used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

### SECTION NO. 7
### BACKGROUND OF HOW UNITED STATES' MONIES
### ARE PAID FOR DRUG CLAIMS UNDER
### THE STATES' MEDICAID PROGRAMS

### A.    FUNDING FOR MEDICAID

97.    The United States Government, under the Secretary of the United States Department of Health and Human Service, is required to pay to each state, for each calendar quarter, an amount equal to the Federal Medical Assistance Percentage ("FMAP") of the total amount expended by the state during the quarter as medical assistance under the state Medicaid plan pursuant to 42 U.S.C. § 1396b(a)(1).

98.    Benefits for drugs are optional but all states have opted to provide Medicaid drug reimbursement coverage in their state plans.

99.    The federal portion of States' Medicaid payments, Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. The federal portion consists of a minimum of 50% up to a maximum of

CIVIL ACTION NO. 00 CV10698 MEL

83%. For example, Florida's FMAP contributed by the United States in the fiscal year October 1, 2003 to September 30, 2004 was 58.93%.

100.    The States, United States Territories and the District of Columbia are required to implement a State Health Plan containing certain specified minimum criteria for payment of claims in order to qualify for federal funds for Medicaid expenditures.  42 U.S.C. §1396a(a)(30)(A).

101.    Each State Health Plan must, in part, provide a formula for payment of reimbursement claims for prescription drugs, and each state's plan must be approved by the Secretary of HHS. The formula determines the reimbursement amount the state plan will pay for each drug manufactured by each manufacturer whose prescription drugs qualify for Medicaid reimbursement, based upon an estimation of the provider's acquisition cost plus a reasonable dispensing fee.  42 CFR §447.331.  Under certain circumstances, the federal Center for Medicare and Medicaid Services ("CMS") may establish a "Federal Upper Limit," binding on all state plans, on the allowable reimbursement for a particular drug.

102.    State and District of Columbia methodologies for arriving at a provider's Estimated Acquisition Cost ("EAC") for each covered drug, as required by 42 CFR §447.331, must be approved by the Secretary of HHS. ·

103.    To claim its FMAP payment, each state must submit a report to the United States Secretary of Health and Human Services reflecting its anticipated Medicaid expenses for the quarter.  The Secretary is required to estimate the state's FMAP

59

CIVIL ACTION NO. 00 CV10698 MEL

entitlement for the quarter, based on the state's report and such other investigation as the

Secretary may find necessary, and pay that amount to the state in such installments as the

Secretary may determine, adjusted for any overpayments or underpayments in prior

quarters. 42 U.S.C. § 1396b(d)(1), (2A). The Secretary's determination of a state's FMAP

entitlement obligates any appropriations available for payments to the state. 42 U.S.C. §

1396b(d)(4).

104.   The DEFENDANTS knowingly reported false, inflated price and cost data for

the specified drugs to the pharmaceutical pricing compendia relied on by the states, or

directly to the states, or both, and therefore caused claims submitted by each state to

officers and employees of the UNITED STATES for FMAP to be greater than they would

have been but for the DEFENDANTS' false price representations. As a result, the

DEFENDANTS caused the United States to expend FMAPs in amounts greater than would

have been expended, but for the Defendants' false reports of price and cost data, and thus

caused injury to the federal fisc.

## B.    MEDICAID PAYMENT OF CLAIMS FOR PRESCRIPTION DRUGS

105.   The Food and Drug Administration ("FDA") assigns National Drug Codes,

called NDC numbers, to identify each drug of each individual manufacturer, by strength

and package size. NDC numbers are generally eleven digits (or 10 digits when the

preceding zero is deleted), with the first five digits identifying the manufacturer or labeler,

the next four digits identifying the product and the last two digits identifying the package

60

CIVIL ACTION NO. 00 CV10698 MEL

size. Providers are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for drugs to the States' Medicaid programs.

106.   The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process claims for Medicaid reimbursement. The States refer to these contractors as fiscal agents.

107.   Prescription drug claims are submitted either in hard copy form or through an electronic claims filing procedure.

108.   At all times relevant to this case, all of the States' Medicaid programs used the DEFENDANTS' representations of drug prices and costs to estimate acquisition costs and determine reimbursement amounts.

109.   The Secretary has approved state plans whose methodology for arriving at a pharmacy's estimated acquisition cost, as required by 42 CFR §447.331, includes:

a.    discounting a percentage off the AWP prices as computed or collected by, and reported by, First DataBank ;

b.    adding a percentage to the WAC prices, as computed or collected by, and reported by, First DataBank;

c.    requiring the drug manufacturers, including the DEFENDANTS, to certify their prices directly in writing to the Texas Medicaid Vendor Drug Program; and

d.    Basing reimbursement on the manufacturers' reports of direct price (DP).

61

CIVIL ACTION NO. 00 CV10698 MEL

110.   The approved State plans for determining Medicaid reimbursement based on WAC have included the following: (information below is for period of time April through June, 2004)

| STATE | DRUG | DISPENSING FEE |
|---|---|---|
| Alabama | WAC -- 9.2% or AWP - 10% | $5.40 |
| Colorado | lesser of AWP - 35% (generic) or AWP - 13.5% (brand) | $4.00 |
| Florida | Lower of WAC +7% or AWP - 13.25% | $4.23 |
| Maryland | Lower of WAC + 8% or AWP - 12% DP + 8% or distributor price | $4.69 |
| Massachusetts | WAC + 6% | $3.50 - $5.00 |
| Ohio | Lower of WAC + 9% or AWP - 12.8% | $3.70 |
| Rhode Island | WAC + 5% | $2.85 - $3.40 |
| Illinois | AWP - 25% (generic) AWP - 12% (brand) | $3.40 - $4.60 |

111.   The Texas Medicaid Program has adopted reimbursement policies and procedures designed to ensure that drug manufacturers, including the DEFENDANTS, provide price and cost information that fairly represents the prices and costs generally and currently available in the marketplace. The Texas Medicaid authorities required the DEFENDANTS to certify, in writing, the accuracy of their price and cost representations as a condition to their drugs being covered for reimbursement.

62

112.   The State of Texas paid reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge to the general public or the Estimated Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the estimated price paid by Providers purchasing a drug from a wholesaler. DEAC is the estimated price paid by a Provider purchasing the drug directly from the drug's manufacturer.

113.   The State of Texas determined the WEAC reimbursement amounts by calculating: 1) the drug manufacturer's "price to wholesaler and/or distributor" (as reported by the manufacturer to the State of Texas) plus 12%, and 2) the manufacturer's AWP, as reported to Texas by the manufacturer, minus a percentage (which percentage has varied throughout the relevant period of the Complaint, but has never exceeded 18%), and then selecting the lesser of the two resulting amounts as the WEAC for payment of claims. DEAC reimbursement represents the drug manufacturers' Direct Price, as reported to Texas by the manufacturer. The Texas Medicaid Program also has often considered the amounts reported by Defendants through First DataBank and prices to chain warehouses as a check or point of comparison to determine if Defendants' direct representations to Texas should be reviewed for correctness.

114.   The State of Texas required the DEFENDANTS, when applying for inclusion of drugs on the Texas Medicaid formula, to state the prices of the drugs on a specified Texas Medicaid Vendor Drug Program form and to certify as follows:

63

> I hereby certify that the information submitted is correct to the best of my knowledge . . . I also agree to inform the Texas Department of Health of any changes in . . . price . . . within fifteen (15) days of such change.

Attached hereto as **Exhibit "5"** is a true and correct copy of a certification required by the

Texas Medicaid Vendor Drug Program during the relevant time period of this Complaint.

115.    CMS sets "Federal Upper Limit" (FUL) amounts limiting the maximum per unit

reimbursement any Medicaid Program may pay for certain multiple source drugs. CMS

may impose a FUL on any multiple source drug if:

       a.    All formulations of the drug have been evaluated as therapeutically

equivalent by the FDA in the most current publication of *Approved Drug Products with*

*Therapeutic Equivalence Evaluations*;

       b.    At least three (3) companies list their version of the drug and their

prices in current national price publishing compendia; and

       c.    The above criteria are met, and the drug is available for sale nationally.

116.    CMS sets the FUL for a drug meeting the above criteria at 15% of the price

of the drug  with the lowest reported price. That price then becomes the FUL for all

manufacturers' forms of the drug, or the maximum per unit amount a State Medicaid

Program can pay for the drug.

117.    State Medicaid Programs reimburse pharmacies for prescription drugs at the

lower of:

       a.    Each State's CMS-approved plan (e.g., in the case of Massachusetts,
           WAC+ 6%);

CIVIL ACTION NO. 00 CV10698 MEL

        b.      the pharmacy's usual and customary charge to the general public; or

        c.      the Federal Upper Limit ("FUL") (the FUL does not apply to certified
                 brand drugs),

plus a reasonable professional or dispensing fee.

118.    Some States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS to compute reimbursement amounts, and they confirm the accuracy of the direct price and cost representations by using the prices reported in the industry compendia.

## SECTION NO. 8
## BACKGROUND OF THE MEDICAID REBATE PROGRAM

119.    After hearings in 1989, Congress concluded that the Federal government, as the largest payer for prescription drugs, was paying significantly more under the States' Medicaid Programs than certain private payors. See, e.g., Skyrocketing Drug Prices: Hearings Before the Special Committee on Aging, United States Senate, 101st. Congress, 290-297 (1989).

120.    Congress addressed this inequity in the Omnibus Budget Reconciliation Act of 1990 ("OBRA 1990"), which established the Medicaid Rebate Program (the "Rebate Program"). PL101-508, 104 Stat. 1388 (1990). The stated purpose of the Medicaid Rebate Program was to give the State Medicaid Programs the "benefit of the best price for which a manufacturer [sold] a prescription drug to any . . . private purchaser." H.R. Rep. No. 881, 101st Cong., 2d Sess. 96 (1990).

65

CIVIL ACTION NO. 00 CV10698 MEL

121.   The Rebate Program requires all manufacturers whose drugs are paid for by Medicaid to enter into an agreement with the Secretary of the Department of Health and Human Services, under which the manufacturer agrees to pay each State a quarterly rebate based on that state's utilization of the manufacturer's drugs. The amount received by a State in rebates is considered a reduction in the total amount expended under any given State's plan.  Therefore, the less any given State receives in rebates, the greater the total amount expended by the State and the more the Federal government must correspondingly pay to each State (because the Federal government contributes a set percentage of the total amount each State expends on Medicaid).  42 U.S.C. §1396 b(a); 42 U.S.C. §1396 r-8(b)(1)(B).

122.   Whether a drug is classified under the Rebate Program as an innovator or a non-innovator is important to drug manufacturers such as DEFENDANTS, because the rebate they must pay under the Medicaid Rebate Program depends on that classification. The Medicaid rebate statute defines "innovator multiple source drug" as a multiple source drug that was originally marketed under an original new drug application ("NDA") approved by the Food & Drug Administration ("FDA").  42 U.S.C. §1396r-8(k)(7)(A)(ii).  Innovator drugs are also commonly referred to as "brand" drugs.  A "non-innovator multiple source drug" is any multiple source drug that is not an "innovator multiple source drug."  42 U.S.C. §1396r-8(k)(7)(A)(iii).  Non-innovator drugs are also commonly referred to as "generic" drugs.

66

CIVIL ACTION NO. 00 CV10698 MEL

## Calculation of Rebate Amount Due to Each State For Innovator Drugs

123.    Under the Rebate Program, 42 U.S.C. §1396r-8(c)(1)(A) and (B), each State's basic rebate amount for each quarterly (three month) rebate period, for each dosage form and strength of a single source drug or innovator multiple source drug (collectively, the "innovator drugs"), has been equal to the product of:

a.    The total number of units of each dosage form and strength paid for under the State Medicaid drug reimbursement plan in the rebate period (as reported by the State); and

b.    the greater of

(i)    the difference between the "Average Manufacturer Price" ("AMP") minus the manufacturer's "Best Price" ("BP") for the dosage form and strength of the drug or

(ii)    the minimum rebate percentage of the AMP (the minimum rebate percentage has been 15.1% since January 1, 1996.[1])

124.    Pursuant to 42 U.S.C. §1396r-8(c)(1)(C), BP is defined as the following:

---

[1]    Prior to that date, the minimum rebate percentage was as follows:
   (i)    12.5 percent after December 31, 1990, and before October 1, 1992;
   (ii)    15.7 percent after September 30, 1992, and before January 1, 1994;
   (iii)    15.4 percent after December 31, 1993, and before January 1, 1995;
   (iv)    15.2 percent after December 31, 1994, and before January 1, 1996.
Temporary limitation on maximum rebate amount - -
   (i)    prior to January 1, 1992, (b) of this paragraph could not exceed 25 percent of the AMP,
   (ii)    After December 31, 1991, and before January 1, 1993, (b) of this paragraph could not exceed 50 percent of the AMP.

67

CIVIL ACTION NO. 00 CV10698 MEL

(i)     The term "best price" means, with respect to a single source drug or innovator multiple source drug of a manufacturer, the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or government entity within the United States, excluding - -

    (I)     any prices charged on or after October 1, 1992, to the Indian Health Service, the Department of Veterans Affairs, a State home receiving funds under section 1741 of title 38, United States Code, the Department of Defense, the Public Health Service, or a covered entity described in subsection (a)(5)(B);

    (II)    any prices charged under the Federal Supply Schedule of the General Services Administration;

    (III)   any prices used under a State pharmaceutical assistance program; and

    (IV)    any depot prices and single award contract prices, as defined by the Secretary, of any agency of the Federal Government.

(ii)    Special rules. The term "best price" - -

    (I)     shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section);

68

(II)    shall be determined without regard to special packaging, labeling, or identifiers on the dosage form or product or package; and

(III)    shall not take into account prices that are merely nominal in amount.

125.    Best Price Exclusion - Nominal Price. A "nominal price," or a price that is "merely nominal in amount," is "a price that is less than 10 percent of AMP." See Medicaid Program: Payment for Covered Outpatient Drugs Under Drug Rebate Agreements With Manufacturers, 60 Fed. Reg. 48442 (Sept. 19, 1995) (hereinafter "60 Fed. Reg. 48442"); see also the rebate agreement entered into between Secretary of the Department of Health and Human Services and drug manufacturers participating in the Medicaid Rebate Program (the "Rebate Agreement"). The statute expressly excludes nominal prices from the calculation of Best Price.


### AMP Calculation

126.    Pursuant to 42 U.S.C. §1396r-8(k)(1), AMP means, during the rebate period, "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts."

127.    For each dosage form and strength of an innovator drug, drug manufacturers must also pay an additional rebate based upon the amount, if any, by which the drug's AMP

69

· CIVIL ACTION NO. 00 CV10698 MEL

has risen (for the calendar quarter beginning with the latter of either July 1, 1990 or the time the drug was first marketed) more quickly than the rate of inflation as determined by reference to the national Consumer Price Index for urban consumers ("CPIU"). 42 U.S.C. §1396r-8(c)(2)(A).

### **Calculation of Rebate Amount Due to Each State For Non-Innovator Drugs**

128.    The Medicaid Rebate Statute provides that each State's basic rebate for all other prescription (non-innovator) drugs has been equal to the product of:

(A)  In general:

1.    the applicable percentage (as described in subparagraph (B)) of the AMP for the dosage form and strength for the rebate period, and

2.    the total number of units of such dosage form and strength dispensed after December 31, 1990, for which payment was made under the State Medicaid drug reimbursement plan for the rebate period.

(B) "Applicable percentage" defined

For purposes of subparagraph (A)(i), the "applicable percentage" for rebate periods beginning -

(i)    before January 1, 1994, is 10 percent, and

(ii)    after December 31, 1993, is 11 percent.

42 U.S.C. §1396r-8(c)(3)(A) and (B).

CIVIL ACTION NO. 00 CV10698 MEL

### DEFENDANTS Report AMP and BP to CMS to Calculate the Medicaid Rebate

129.   Manufacturers report their AMPs and BPs to CMS on a quarterly basis. CMS, in turn, calculates the rebate amount as either AMP minus BP (or uses the current 15.1% minimum) for innovator drugs, or AMP multiplied by 11% (or 10% prior to 1994) for non-innovator drugs, and compares the CPIU to any rise in the AMP of each innovator drug. CMS then forwards the resulting rebate amounts by NDC number (the identification number for each dosage and unit size for each drug), to each State. Each State then multiplies the rebate amount for each NDC number by the number of units of that drug that the State paid for during the quarter to determine the rebate amount due and submits this amount to the manufacturer for payment. The manufacturer remits its payment to the state on a quarterly basis, withholding any disputed amount.

### SECTION NO. 9
### THE FALSE CLAIMS SCHEMES

### A.   DEFENDANTS' SCHEMES RESULTED IN MULTIPLE VIOLATIONS OF THE FALSE CLAIMS ACT

130.   By knowingly reporting falsely inflated cost and price representations bearing no reasonable relation to the prices generally and currently paid by Providers in the marketplace for the specified drugs, both directly to Medicare/Medicaid and indirectly by means of the various drug price and cost publishing compendia, the DEFENDANTS caused Providers to submit false claims for excessive reimbursement to Medicare/Medicaid.

71

CIVIL ACTION NO. 00 CV10698 MEL

Pursuant to this kickback scheme engineered by DEFENDANTS, Providers then received a windfall financial benefit from Medicare/ Medicaid in the amount by which the Government's approved "reimbursement" amount exceeded a reasonable estimate of acquisition costs generally and currently available to Providers in the marketplace. Each DEFENDANT is liable, therefore, for damages to Medicare/Medicaid and other governmental health care programs under the False Claims Act, 31 U.S.C. §§3729-3732.

131.    Each DEFENDANT acted knowingly, as that term is defined in the False Claims Act, in providing the false and misleading price and cost information and in marketing the inflated Spread, which actions caused Medicare/Medicaid to pay claims for the DEFENDANTS' drugs in excessive amounts.

132.    Liability For Damages To Medicaid And Medicare As To Specified Medicare/Medicaid Drugs --

a.  As the DEFENDANTS knew, when Providers purchased a drug for which the reported prices and costs were falsely inflated, not only would Providers receive excessive reimbursement under Medicaid for such drug but, in all likelihood, the Provider would receive excessive reimbursement under Medicare as well. Also as DEFENDANTS knew, this was true even in the case of multiple-source Medicare drugs because in addition to DEFENDANTS' own inflated reported AWPs, other drug manufacturers were falsely inflating their AWPs for competing versions of such drugs falling under the same HCPCS code. The DEFENDANTS were aware of the amount of excessive reimbursement which a Provider would receive under Medicare and Medicaid for their specified drugs.

72

CIVIL ACTION NO. 00 CV10698 MEL

         b.   DEFENDANTS inflated their reported price and cost information and marketed the inflated Spread resulting therefrom, to increase the sales of their respective specified drugs to Providers. As a result, they caused false claims for excessive reimbursement to be made to both the Medicare and Medicaid Programs. But for each DEFENDANT'S actions, Medicaid/Medicare would not have paid the excessive reimbursement amounts that were in fact paid for each DEFENDANT'S respective specified drugs. Each DEFENDANT is thus liable under the False Claims Act for each Medicare and Medicaid reimbursement claim for its respective specified drugs which resulted in payment of a falsely inflated reimbursement amount.

        133.   <u>Medicaid Drugs and Single Source Medicare Drugs</u> -- As the DEFENDANTS knew, for any given drug covered by Medicaid, only the reported price or cost of that specific drug was utilized to calculate the reimbursement amount, and not the reported price or cost of any competing brand or generic version of the same drug with a different NDC number. As the DEFENDANTS also knew, for any single source drug covered by Medicare, only that drug's reported AWP was utilized to calculate the Medicare reimbursement amount since no competing brand or generic version sharing the same HCPCS code existed.

        134.   <u>Joint And Several Liability As To Multiple-Source Drugs Under Medicare</u> --

        a.   Each DEFENDANT which reported a falsely inflated AWP for its brand or generic version of a drug falling under a given HCPCS code is jointly and severally liable with every other DEFENDANT that reported a falsely inflated AWP for its version of the drug falling under that HCPCS code, for the sum of all falsely inflated reimbursement amounts

paid to Providers under that HCPCS code. In particular: 1) each DEFENDANT knowingly engaged in the same wrongful conduct, namely, reporting an inflated AWP; 2) each DEFENDANT acted concurrently and in concert with other drug manufacturers in reporting falsely inflated AWPs; 3) each DEFENDANT knew that other drug manufacturers were inflating their AWPs on their respective version of the drug; 4) it was foreseeable by each DEFENDANT that their wrongful conduct (reporting an inflated AWP) could, if combined with the same wrongful conduct on the part of another drug manufacturer(s), jointly cause an inflated reimbursement amount to be paid to Providers for the drug; 5) the DEFENDANTS' wrongful conduct did in fact combine to jointly cause the payment of an inflated reimbursement amount for the drug; and 6) in each instance the harm resulting from DEFENDANTS' similar conduct in reporting inflated AWP's was inflicted upon the same entity, namely, the Federal Government.

b.    DEFENDANTS knew the applicable drug reimbursement formula for multiple-source drugs and knew if not specifically, at least approximately, the amount of reimbursement a Provider would receive under Medicare for their specified drugs. The DEFENDANTS also knew that other drug manufacturers were inflating their reported AWPs for such specified drugs and thus knowingly participated jointly in a scheme that caused Providers to receive excessive reimbursements for such specified drugs under Medicare. The DEFENDANTS had no legitimate business purpose for inflating the reported AWP's of their specified drugs. In fact, the DEFENDANTS engaged in that practice only to illegally inflate the drug reimbursement amounts calculated and paid by both Medicare and the

74

State Medicaid Programs, in order to increase sales of their respective specified drugs at the expense of those governmental programs. With respect to each specified drug which was a multiple-source drug reimbursed under Medicare, DEFENDANTS that: 1) were sources of any brand or generic version of such drug falling under a given HCPCS code, and 2) knowingly reported inflated AWP information with respect to their versions of such drug, were therefore jointly and severally liable for the sum of the falsely inflated reimbursement amounts paid to Providers for all brand and generic versions of that multiple-source drug.

135.   Joint And Several Liability As To Multiple-Source Drugs Under Medicaid –

a.   Many State Medicaid programs reimburse certain Providers, such as physicians, for multiple-source drugs by using a methodology similar to the J Code Medicare reimbursement methodology previously described herein. To the extent that any DEFENDANT jointly with other drug manufacturer(s) caused inflated reimbursement amounts to be paid for any multiple-source drug under any such State Medicaid reimbursement methodology, each such DEFENDANT is jointly and severally liable for the total of the falsely inflated reimbursement amounts paid for all versions of such multi-source drug for the reasons set forth in the preceding paragraph.

b.   Some of the specified drugs are multiple-source drugs which are subject to a Federal Upper Limit ("FUL") for Medicaid purposes. Those drugs subject to an FUL are oral drugs dispensed and billed to Medicaid by pharmacies(drugs dispensed in connection with physician services claims are not subject to an FUL). Pursuant to the FUL

75

limits, the reimbursement amount for such drugs has been capped at 150 percent of the reported price for the least costly therapeutically equivalent version of the drug plus a reasonable dispensing fee. 42 CFR §447.331-333. Each DEFENDANT who manufactured a drug subject to an FUL and reported a falsely inflated price or cost with respect to such drug is, therefore, jointly and severally liable (along with all other DEFENDANTS who engaged in the same wrongful conduct with respect to such drug) for the sum of all falsely inflated reimbursements paid for all versions of that drug. In this regard, each such DEFENDANT: a) knowingly reported falsely inflated price and cost information with respect to such drug, b) knew the reimbursement methodology for an FUL drug, and c) knew that if it provided prices and costs generally and currently available in the marketplace, the reimbursement amount would not have been inflated beyond what the FUL was intended to allow. Each such DEFENDANT also knew that if the DEFENDANT reported an inflated price or cost for its version of the drug, it was foreseeable that the reimbursement amount, despite the FUL, would be excessive, particularly since the DEFENDANT knew, or had ample reason to believe, that other drug manufacturers were falsely inflating their reported prices and/or costs for their respective versions of such multiple-source drug.

. 136.  Joint And Several Liability Arising From Drug Marketing Agreements –  At various times certain DEFENDANTS entered into contractual relationships ("Drug Marketing Agreements"), with other drug companies to either: a) market and sell a drug which the other drug company manufactured or b) allow another drug company to market and sell a drug the DEFENDANT manufactured.  When Providers sought Medicare/Medicaid

76

CIVIL ACTION NO. 00 CV10698 MEL

reimbursement for drugs subject to such a marketing agreement, the reimbursement amount typically was calculated with reference to the prices and costs reported by the manufacturer. When these reported prices and costs were falsely inflated, therefore, both the drug company with marketing rights and the drug manufacturer, enjoyed the benefit of the resulting inflated reimbursement amounts through increased sales. Drug companies with marketing rights knew that drug manufacturers had falsely inflated the reported prices and costs of the drugs covered by Drug Marketing Agreements. In essence then, when manufacturers of drugs subject to Drug Marketing Agreements reported falsely inflated prices and costs of those drugs, both the manufacturers and the marketers were knowingly participating jointly in a scheme that enabled Providers to receive excessive Medicare/Medicaid reimbursement for such drugs. Therefore, to the extent certain DEFENDANTS entered into such Drug Marketing Agreements to either grant or to receive marketing and selling rights to drugs for which prices and costs were falsely inflated, they are each jointly and severally liable with the other party to such Agreement for the sum of the falsely inflated reimbursement amounts paid to Providers for such drugs.

137.    The DEFENDANTS knew that Medicare/Medicaid would not pay or approve claims for the specified drugs if it were disclosed to Medicare/Medicaid that said claims were for amounts that included kickbacks.

138.    The DEFENDANTS also knew that the Providers, in presenting claims for the specified drugs to Medicare/Medicaid, would not and did not disclose that the claim amounts included kickbacks.

77

139.    Each of the DEFENDANTS carried out its scheme to defraud Medicare/Medicaid by knowingly providing false and misleading price information directly or indirectly to Medicare/Medicaid so that Providers would be reimbursed in excessive amounts for its drugs. The DEFENDANTS thus each participated in a fraudulent scheme to cause Medicare/Medicaid to pay and approve false claims in excessive amounts.

140.    Each of the claims in question is a false claim under the False Claims Act, in part, because each was supported by, and the reimbursement amount was determined from, the false and misleading price information provided by the DEFENDANTS in connection with their respective specified drugs.

141.    The false claims at issue in this action are all claims for reimbursement submitted to Medicare/Medicaid  by or on behalf of Providers that sought and received payments in excessive amounts because of  false and misleading price and cost representations made by the DEFENDANTS directly or indirectly to Medicare/Medicaid. The false claims at issue number in the tens of thousands, and were submitted by thousands of Providers nationwide throughout the relevant time period of the Complaint. Each claim is in the possession of Medicare or one of the applicable State Medicaid Programs.

142.    For many of the Specified Drugs, the Relator has identified the false claims to the Federal government by providing prices generally and currently available in the marketplace that were concealed from Medicare/Medicaid by the DEFENDANTS for each specified drug; by providing specific identification information about the Specified Drugs;

78

CIVIL ACTION NO. 00 CV10698 MEL

and by providing the specific false price representations in question from which the Relator and the Federal government identified the specific false claims.

143.   The damages sought herein include, but are not limited to, those arising from the false claims for the specified drugs set out in Sections 15 through 37 and elsewhere throughout this Third Amended Complaint. The damages sought herein also encompass all damages and penalties recoverable by reason of the false claim schemes of the DEFENDANTS alleged herein, relating to all drugs of all sizes, to the extent that the false price representations or records of DEFENDANTS were used in connection with, considered or made available in, caused, aided or otherwise affected the presentment, payment or approval of false claims. These claims also encompass recovery of the funds paid for false claims due to the DEFENDANTS' false drug price representations, regardless of the Federal or State program that actually expended the funds, the person or entity that ultimately received the funds, or the person or entity from which the Federal government or the States ultimately recovers the funds.

**B.     THE NATURE AND IMPACT OF THE DEFENDANTS' FALSE CLAIM SCHEMES**

144.   **DEFENDANTS Actively Used the Inflated Spread as a Marketing Tool Directed at Providers to Promote Increased Sales of the Specified Drugs.**  By means of, among other things, inflated Spreads posted on Econolink and other wholesaler computer programs, direct mailing, facsimile transmission and verbal communications by sales representatives, DEFENDANTS repeatedly and systematically promoted the inflated

79

CIVIL ACTION NO. 00 CV10698 MEL

reimbursement amounts Providers would receive from both Medicare and Medicaid as a result of DEFENDANTS' inflated reported prices and costs.

145.



CIVIL ACTION NO. 00 CV10698 MEL

146.   **Reported Prices On Drugs Sometimes Rose While Prices In The Marketplace Stayed Constant Or Decreased.** The Government and its health program beneficiaries were damaged when the DEFENDANTS created a financial inducement for Providers to order drugs by increasing the Spread over time.

### SECTION NO. 10
### THE DEFENDANT DRUG MANUFACTURERS'
### KNOWLEDGE OF THE FALSE CLAIMS SCHEMES

147.   The DEFENDANTS were prohibited by the False Claims Act from causing the presentation of false claims for Government funds, were required by the Food and Drug Act to refrain from reporting misleading information about their drug products, and were prohibited by the Medicare and Medicaid Anti-Kickback laws from arranging financial inducements for Providers.

148.   The patients and third party payers, including the Medicare and State Medicaid Programs, were not aware of the prices for the specified drugs generally and currently available in the marketplace to the physician, clinic or pharmacy presenting claims for reimbursement. The DEFENDANTS concealed from the Medicare and State Medicaid Programs price reductions occurring due to competition in the marketplace and falsely and fraudulently reported drug prices that far exceeded the prices generally and currently available in the marketplace.

149.   At all times material to this action, each of the DEFENDANTS acted "knowingly" as that term is defined at 31 U.S.C. §3729(b):

81

CIVIL ACTION NO. 00 CV10698 MEL

a.    In causing false or fraudulent claims to be presented for payment or approval by the Medicare and State Medicaid programs; and

b.    In making or using false statements or records to get false or fraudulent claims approved or paid by the Medicare and State Medicaid Programs.

150.    The DEFENDANT DRUG MANUFACTURERS knew the following:

a.    Each of the DEFENDANT DRUG MANUFACTURERS knew that Medicaid was required to pay claims based upon the Estimated Acquisition Cost ("EAC") of the drugs to the Provider submitting the claim. 42 C.F.R. §447.331.

b.    Each of the DEFENDANT DRUG MANUFACTURERS knew that federal statutes and regulations limited reimbursement of Medicaid claims for the specified drugs to a reasonable estimation of the acquisition cost.

c.    Each of the DEFENDANT DRUG MANUFACTURERS knew that neither Medicare nor Medicaid was authorized or permitted by applicable law to pay claims for the specified drugs in excessive amounts.

d.    Each DEFENDANT DRUG MANUFACTURER knew that the State Medicaid Programs contracted through their fiscal agents with First Databank and Medi-Span to obtain the DEFENDANT's reported prices and costs and used the prices from First Databank and Medi-Span in estimating acquisition costs for the specified drugs for reimbursement purposes.

82

CIVIL ACTION NO. 00 CV10698 MEL

      e.     Each DEFENDANT knew that Medicare, through its Carriers and DMERCs, utilized DEFENDANTS' reported AWP prices as contained in Red Book, to establish its reimbursement amounts for the specified drugs.

      f.     Each of the DEFENDANT DRUG MANUFACTURERS knew that they were supplying to First DataBank, Red Book and Medi-Span, prices and costs which these price and cost publishing compendia reported to Medicare and/or Medicaid and that these compendia relied on DEFENDANTS to obtain the prices they reported.

      g.     Each of the DEFENDANTS knew highly detailed information about the sales of its specified drugs, required wholesalers to report sales information back to it, and wholesalers did in fact routinely report back to each of the DEFENDANTS, all prescription drug sales by NDC number, provider name and the actual price the Provider had paid.

      h.     Each of the DEFENDANTS knew, and in fact, closely monitored the prices, with and without discounts, that Providers as well as wholesalers were paying for DEFENDANTS' specified drugs. Such information was of utmost importance to DEFENDANTS in conducting their business affairs such as calculating and projecting revenue and profits, and making marketing, manufacturing and distribution decisions.

      i.     Each of the DEFENDANTS knew they were able to report price and cost information which fairly and reasonably represented market prices and had information readily available to it which would have enabled it to report price and cost information which fairly and reasonably represented sales in the marketplace.

83

CIVIL ACTION NO. 00 CV10698 MEL

j.    Each of the DEFENDANTS knew of the approximate size of the Spread for its specified drugs under both Medicare and Medicaid.

k.    Each of the DEFENDANTS knew that prices it reported to First DataBank, Red Book and Medi-Span, or directly to a state Medicaid program, were false, and were vastly higher than the prices Providers were generally and currently paying for their specified drugs.

l.    Each of the DEFENDANTS knew that the greater the Spread on a drug, the greater the inducement to a Provider to purchase that drug instead of a competing brand or generic drug.

m.    Each of the DEFENDANTS systematically concealed from or otherwise failed to report to drug pricing and cost reporting compendia and state Medicaid programs, decreases in prices of the specified drugs to Providers.

n.    Each of the DEFENDANT DRUG MANUFACTURERS knew that Federal and State statutes and regulations prohibited them from making misleading . representations about the specified drugs, including misleading price or cost representations.

151.    Each of the DEFENDANT DRUG MANUFACTURERS was required to comply with the Federal Food, Drug and Cosmetic Act 21 U.S.C. §321 et seq., and the regulations promulgated pursuant thereto.

84

CIVIL ACTION NO. 00 CV10698 MEL

152.    The DEFENDANTS' price and cost representations about the specified drugs constituted advertising subject to the "labeling" provisions of the Federal Food and Drug Act and related regulations. 21 C.F.R. §202.1(l).

153.    Each of the DEFENDANT DRUG MANUFACTURERS was prohibited from disseminating any information about the prices or costs of its specified drugs that was "false or misleading in any particular . . ." 21 U.S.C. §352.

154.    Each of the DEFENDANT DRUG MANUFACTURERS had a duty to ensure that its representations about prices and costs of the specified drugs were not misleading, taking into account:

> . . . not only representations made or suggested by statement, word, design, device, or any combination thereof, but also to the extent to which the labeling or advertising fails to reveal facts material in light of such representations.

21 U.S.C. §321(n).

155.    The DEFENDANT DRUG MANUFACTURERS regularly made to State Medicaid Programs direct representations of false price and cost information that were utilized by those Programs in approving and paying Providers' reimbursement claims.

156.    The DEFENDANT DRUG MANUFACTURERS knew and were fully capable of reporting the prices and costs of the specified drugs generally and currently available in the marketplace and did so when it was economically beneficial to them, a fact that further illustrates that they acted knowingly when reporting falsely inflated prices and costs to drug price publishing compendia and directly to state Medicaid programs.

85

157.   The DEFENDANT DRUG MANUFACTURERS participated in the Medicaid Rebate Program (the "Rebate Program") mandated by the Federal Omnibus Budget Reconciliation Act of 1990 ("OBRA '90") and thus were required to pay rebates to State Medicaid Programs.  The goal of the Rebate Program was to provide Medicaid with the benefit of the drug manufacturers' best prices, as defined by 42 U.S.C. §1996r-8(c)(1)(C). In reporting prices to the Rebate Program, it was in the economic interests of the DEFENDANT DRUG MANUFACTURERS to report the lowest Average Manufacturers Price ("AMPs") possible based upon the data available to them.

158.   Each DEFENDANT DRUG MANUFACTURER was on notice that it was prohibited by federal statute from paying, directly or indirectly, money or other financial benefit to induce its customers to order the specified drugs when the Medicare or State Medicaid Programs would be paying reimbursement claims. 42 U.S.C. §1320a-7b(b)(2).

159.   Notwithstanding the requirements of the False Claims Act, Anti-Kickback laws, Anti-Referral laws, and Food Drug and Cosmetic Act, the DEFENDANTS, acting individually and in concert with one another, purposely created confusion and made false and misleading statements about drug pricing in order to deceive the United States Government and the States' Medicaid Programs.  For several years, various Governmental agencies, including the HHS Office of Inspector General ("OIG") and the General Accounting Office ("GAO"), attempted to inquire into the reasonableness of reimbursements by the Medicare and States' Medicaid Programs for many of the drugs at issue in this Third Amended Complaint.  The DEFENDANTS thwarted the efforts of the OIG and GAO by withholding

and concealing pertinent information. The OIG and GAO attempted to discover whether unreasonable reimbursements were being made; however, they were unsuccessful due to the DEFENDANTS' actions.    The DEFENDANTS concealed and disguised the unreasonable reimbursements that they caused the Medicare and the state Medicaid programs to make by the following devices and circumstances:

        a.     The DEFENDANTS reported the prices and costs generally and currently available in the marketplace for many of their drugs yet concealed and disguised the false inflated prices and costs reported for certain other drugs, including those referenced in this Third Amended Complaint.

        b.     Some of the DEFENDANTS reported or caused the reporting of cost and price in terms of "List Price," "Wholesale Net," "Direct Price" ("DP" or "DIRP"), or "Wholesaler Acquisition Cost" ("WAC"), to which Medical Economics and First DataBank applied mark-up factors supplied by those DEFENDANTS to calculate AWPs for those DEFENDANTS' drugs. Those DEFENDANTS inflated their reports of cost and price to First DataBank, claimed First DataBank set the AWPs for their drugs, and therefore utilized First DataBank to conceal and disguise their false inflated reports of cost and price.

        c.     Some of the DEFENDANTS made or caused inflated representations of cost and price in terms of both AWP and DP (or DIRP) to First DataBank and/or Red Book. These DEFENDANTS relied on First DataBank and Red Book to report the inflated representations of cost and price to conceal the source of the reported costs and prices.

87

CIVIL ACTION NO. 00 CV10698 MEL

Some DEFENDANTS reported false inflated WACs or other prices to First Databank and/or Red Book to conceal and disguise the source of the reported costs and prices.

## SECTION NO. 11
## DAMAGES TO GOVERNMENT PROGRAMS CAUSED
## BY THE DEFENDANTS' FRAUD SCHEMES

160.    Damages are recoverable from the Defendants based on a number of factors including reimbursement rates, number of reimbursement claims paid and rebates paid under the Medicaid Rebate Program.

161.    First, because of the excessive reimbursements paid by governmental health care programs for the specified drugs by reason of the DEFENDANTS' false price representations, the United States has been damaged to the extent of the excessive reimbursements paid by Medicare. Further, the United States has been damaged to the extent of its share of the excessive reimbursements paid by the state Medicaid programs for those drugs. In addition, the DEFENDANTS' underpayment of rebates under the Medicaid Rebate Program has damaged the United States in the amount by which the federal share of the expense of the state Medicaid programs would have been reduced had the DEFENDANTS not made falsely concealed, avoided·or reduced their obligation under the Rebate Program.

162.    As explained in Section 8, infra, the Rebate Program requires manufacturers whose drugs are paid for by Medicaid to pay rebates to the States every quarter. The rebates are paid based on whether a drug is classified as an innovator, or brand drug, or

88

as a non-innovator drug, or generic drug. Manufacturers pay higher rebates for innovator drugs than they do for non-innovator drugs.

163.   For innovator drugs, commonly referred to as brand drugs, Defendants pay to each state quarterly, for each drug, a Medicaid Rebate equal to the total number of units of each dosage form and strength paid for under the State Medicaid reimbursement plan (the "utilization"), multiplied by the greater of (a) AMP minus BP or (b) the minimum rebate percentage of the AMP (currently 15.1%)[2]. The calculation of rebate due is made for each dosage form and strength of each drug.

164.   For non-innovator drugs, commonly referred to as generic drugs, Defendants pay to each state quarterly, for each drug, a Medicaid Rebate equal to the total number of units of each dosage form and strength paid for under the State Medicaid reimbursement plan multiplied by the applicable rebate percentage of the AMP (currently 11%)[3].

165.   AMP, a price used in calculating the manufacturers' Medicaid Rebate obligations for both innovator and non-innovator drugs, as described infra in Section 8, is defined by statute as the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after

---

[2]Since January 1, 1996 the applicable percentage for rebates for innovator drugs has been 15.1 percent. Prior to that date, the minimum rebate percentage was as follows: 12.5 percent after December 31, 1990, and before October 1, 1992; 15.7 percent after September 30, 1992, and before January 1, 1994; 15.4 percent after December 31, 1993, and before January 1, 1995; and 15.2 percent after December 31, 1994, and before January 1, 1996. Additionally there was a temporary limitation on maximum rebate amount prior to January 1, 1992 the rebate for innovator drugs could not exceed 25 percent of the AMP and after December 31, 1991, and before January 1, 1993, the rebate for innovator drugs could not exceed 50 percent of the AMP. 42 U.S.C. §1396r-8(c)(1)(B).

[3]Before January 1, 1994, the applicable percentage was 10 percent, and for after December 31, 1993 to the present date, the applicable percentage is 11 percent.   42 U.S.C. §1396r-8(c)(3)(A) and (B).

89

CIVIL ACTION NO. 00 CV10698 MEL

deducting customary prompt pay discounts. The manufacturer calculates AMPs for its drugs based on its own business records and information and reports its AMPs to the Department of Health and Human Services. 42 U.S.C. §1396r-8(k)(1).

166.    Additionally, for each dosage form and strength of an innovator drug, drug manufacturers must pay an additional rebate based upon the amount, if any, by which the drug's AMP has risen more quickly than the rate of inflation as determined by reference to the national CPI.

### Best Price and Bundled Sales

167.    Pharmaceutical manufacturers, including the DEFENDANTS, often marketed and sold their drugs in "bundles" featuring rebates or discounts to the purchaser.    A "Bundled Sale", as defined in the Medicaid Rebate Agreement, refers to the packaging of drugs of different types where the condition of rebate or discount is that more than one drug type is purchased, or where the resulting discount or rebate is greater than that which would have been received had the drug products been purchased separately.    Pursuant to Medicaid regulations and the terms of Rebate Agreements between drug manufacturers and the Government, discounts, or other price reductions, must be allocated proportionately to the dollar value of the units of each drug sold under the bundled agreement when calculating "best price".

168.    Proportionate allocation of discounts within bundles is thus required when calculating the correct rebate amounts to be paid by drug manufacturers, including the

90

Defendants, under the Medicaid Rebate Program. To determine correctly the "best price" for each covered drug for each quarter, it must be determined whether the drug was ever sold in a bundle during the quarter. If so, the proportionate impact of any discounts on any drugs in all such bundles must be accounted for in calculating the "best price" of each drug.

169.  Proportionate allocation of discounts within a bundle is required with respect to any innovator drugs which were bundled with another drug. The higher the reported best price, the smaller the rebate due on an innovator drug, subject to the minimum of 15.1%. Throughout the time periods specified herein, the best price of any innovator drug bundled with another drug (hereinafter referred to as "the Bundled Drugs") was required to be calculated by proportionately allocating all discounts among all drugs in the bundle. Therefore, to the extent the Defendants did not allocate the discount on drugs proportionately within a bundle, they necessarily reported a falsely inflated best price for any Bundled Drug.

170.  To the extent that any DEFENDANT submitted incorrect AMP or BP information to the Government, the calculation of damages to Government programs should be adjusted accordingly.

91

CIVIL ACTION NO. 00 CV10698 MEL

### SECTION NO. 12
### DEFENDANTS CONSPIRED TO DEFRAUD
### THE MEDICARE AND MEDICAID PROGRAMS

171.  The DEFENDANTS conspired to defraud the Medicare and Medicaid Programs through their conduct alleged as follows:

a.  Each DEFENDANT elected and acted to cause its specified drugs to be listed for reimbursement by the Medicare and Medicaid Programs, and each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which they competed, that other DEFENDANTS had also elected and acted to cause their corresponding competing drugs to be listed for reimbursement by the Medicare and Medicaid Programs.

b.  Each DEFENDANT knowingly reported inflated price and cost information for its specified drugs to First DataBank, Medi-Span and Red Book with further knowledge that such misleading information would be used by Medicare and Medicaid and would result in those programs setting inflated reimbursement amounts for the specified drugs.

c.  Each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which they competed, that other DEFENDANTS had also reported inflated price and cost information to First DataBank, Medi-Span and Red Book for their corresponding competing drugs with further knowledge that such misleading information would be used by Medicare and Medicaid and would result in those programs setting inflated reimbursement amounts for the specified drugs.

92

     d.    Each DEFENDANT made a conscious decision to compete with one or more other DEFENDANTS in the marketplace by creating financial inducements for their customers by reporting falsely inflated price and cost information for the specified drugs to First DataBank, Medi-Span and Red Book. Each DEFENDANT also knew that one or more other DEFENDANTS with which it was competing was also reporting falsely inflated price and cost information for their competing drugs to First DataBank, Medi-Span and Red Book for the same purpose.

     e.    At all times material, senior employees of First DataBank and Red Book knew that the price and cost information being reported by the DEFENDANTS for the specified drugs was false and misleading and was being reported by First DataBank and Red Book, to the Medicare and Medicaid programs for their use in setting reimbursement amounts.

     f.    First DataBank and Red Book entered into agreements with and acted in concert with each DEFENDANT to report inflated price and cost information to Medicare and Medicaid notwithstanding its false and misleading nature and with knowledge that each DEFENDANT was reporting the false price and cost information to compete with one or more other DEFENDANTS.

     g.    First DataBank, Medi-Span and Red Book thus acted as essential "hubs" by agreeing with each DEFENDANT (the "spokes") separately to report the false and misleading price and cost information that was essential to the fraudulent and misleading means of competition that each DEFENDANT had elected to engage in.

93

CIVIL ACTION NO. 00 CV10698 MEL

h.    Each of the DEFENDANTS knowingly concealed from the Medicare and Medicaid programs the prices and costs paid for the specified drugs by wholesalers, distributors and GPOs. The wholesalers, distributors and group purchasing organizations included McKesson Corporation, AmerisourceBergen (formerly Amerisource and Bergen), Cardinal, Ultracare, Triad, National Specialty Services, Medical Specialties, Gerimed (and affiliated companies including FxMed and IVmed), Pharmaceutical Buyers, Inc. (PBI), ASD Specialty Healthcare (ASD), Florida Infusion, Oncology Therapeutics Network (OTN), Oncology Supply, Innovatix, Greater New York Hospital Association (GNYHA), Oncology Solutions, International Oncology Network (ION) and Health Care Purchasing Agency (HCPA) (hereinafter the "specified wholesalers, distributers and GPOs")

i.    Each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which it competed, that other DEFENDANTS had also concealed from the Medicare and Medicaid programs the prices paid for corresponding competing drugs by wholesalers, distributors and GPOs from Medicare and Medicaid.

j.    Each DEFENDANT concealed prices and costs generally and currently available in the marketplace for the specified drugs with knowledge that the concealment would cause the Medicare and Medicaid programs to set inflated reimbursement amounts for the specified drugs.

k.    Each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which it competed, that other DEFENDANTS had also concealed prices generally and currently available in the marketplace for the corresponding

94

competing drugs with knowledge that the concealment would cause the Medicare and Medicaid programs to set inflated reimbursement amounts for the specified drugs.

l.      Each DEFENDANT made a conscious decision to compete with one or more other DEFENDANTS in the marketplace by concealing from the Medicare and Medicaid programs prices generally and currently available in the marketplace for the specified drugs, such as those paid by wholesalers, distributors and GPOs, and each DEFENDANT knew that one or more other DEFENDANTS with which it was competing was also concealing prices generally and currently available in the marketplace for the corresponding competing drugs, such as those paid by wholesalers, distributors and GPOs.

m.      At all times material, senior employees of the specified wholesalers, distributors and GPOs knew that the price and cost information for the specified drugs being reported by the DEFENDANTS to First DataBank, Red Book and Medi-Span was false and misleading and was being provided to the Medicare and Medicaid programs for use in determining reimbursement amounts.

n.      The specified wholesalers, distributors and GPOs entered into agreements with and acted in concert with each DEFENDANT to conceal from the Medicare and Medicaid programs the prices generally and currently available in the marketplace for the specified drugs, notwithstanding the false and misleading nature of the price reports to First DataBank, Red Book and Medi-Span and despite knowing that each DEFENDANT was reporting the false price and cost information and concealing the price and costs

95

CIVIL ACTION NO. 00 CV10698 MEL

generally and currently available in the marketplace for the specified drugs to compete with one or more other DEFENDANTS.

        o.    The specified wholesalers, distributors and GPOs thus acted as essential "hubs" by agreeing with each DEFENDANT (the "spokes") separately to conceal the prices and costs generally and currently available in the marketplace for the specified drugs. That concealment was essential to the fraudulent and misleading means of competition that each DEFENDANT had elected to engage in.

        172.   Because of DEFENDANTS' conduct in violation of the False Claims Act, 31 U.S.C. 3730(a)(3), the United States has sustained damages as described in the Requests for Relief herein.

## SECTION NO. 13



96

CIVIL ACTION NO. 00 CV10698 MEL

# PAGES 97 THROUGH 100

# HAVE BEEN COMPLETELY REDACTED

# WHICH INCLUDES PARAGRAPHS

# 174 THROUGH 182

97

CIVIL ACTION NO. 00 CV10698 MEL

## SECTION NO. 14
## THE DEFENDANTS HAVE REPEATEDLY UNDERMINED EFFORTS
## OF THE FEDERAL AND STATE GOVERNMENTS TO ENSURE
## THAT GOVERNMENT DRUG REIMBURSEMENT AMOUNTS ARE REASONABLE

183.   The DEFENDANTS each knowingly and actively impeded the numerous efforts made by the government to provide for reimbursement of prescription drugs at a reasonable rate.

184.   **Defendants Intentionally Impeded the Governments' Efforts to Accurately Estimate Providers' Drug Costs under Medicare/Medicaid.** DEFENDANTS impede such efforts on the part of the government by knowingly reporting inflated price and cost information, as alleged throughout this Third Amended Complaint, and by additional affirmative acts such as those alleged herein.

185.   **Some State Medicaid Programs Took Exceptional Measures In Their Efforts To Verify That Drug Manufacturers Provide Good Faith Price And Cost Information For Reimbursement Purposes.** By way of example, the Texas Medicaid authorities, during the time at issue in this Third Amended Complaint, required each of the DEFENDANTS to certify, in writing, their price and cost representations as a condition of their drugs being covered for reimbursement. The Relator's investigation has revealed that each of the DEFENDANTS, when responding to Texas, either affirmatively lied about the prices generally and currently available in the marketplace, or omitted material information in order to mislead the Texas Medicaid officials.

186.   Had the DEFENDANTS disclosed price and cost information about the specified drugs based on prices generally and currently available in the marketplace, Texas

CIVIL ACTION NO. 00 CV10698 MEL

to best commercial customers in the market place without controlling or affecting the prices generally and currently available to Providers in the marketplace.

189. **The DEFENDANTS Directly Misrepresented Price and Cost Information for the Specified Drugs to State Medicaid Programs.** The States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS and use them to compute reimbursement amounts. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

CIVIL ACTION NO. 00 CV10698 MEL



191.    **The DEFENDANTS' False Claim Scheme deprived the Government of the protection of The Federal Upper Limits ("FUL")**. CMS limits Medicaid reimbursement for certain therapeutically equivalent, multisource oral drugs by setting a "Federal Upper Limit" ("FUL") on the amount any state's Medicaid program may pay for any version of those

CIVIL ACTION NO. 00 CV10698 MEL

drugs. Because the FUL applicable to all versions of a particular multisource drug is determined with reference to the reported prices of all versions of that drug, a single manufacturer's false, inflated price reports can cause the FUL for all versions of that drug to be set at a higher amount than would be set if the manufacturer reported the prices generally and currently available in the marketplace, based on its own business records and information. Thus, FULs distorted by the false price reports of manufacturers, including the DEFENDANTS, to recognized publishing compendia circumvented the Government's efforts to limit amounts paid for claims. One false report can affect the FUL by distorting the median price.

### SECTION NO. 15



192.

CIVIL ACTION NO. 00 CV10698 MEL

# PAGES 106 THROUGH 124

## Which Includes the End of Paragraph 192 through Paragraph 211

## HAVE BEEN COMPLETELY **REDACTED**

CIVIL ACTION NO. 00 CV10698 MEL

## SECTION NO. 20
## THE SPECIFIC FALSE PRICE AND COST
## REPRESENTATIONS OF DEFENDANT
## DEY AS TO MEDICARE AND MEDICAID

212.    From on or before December 31, 1997 and continuing through the present date,  DEY knowingly caused Medicare/Medicaid to pay false or fraudulent claims for prescription drugs, including those specified in this Section, and further made or used false records or statements to get such false or fraudulent claims paid or approved. As a result of the said actions of  DEY and those persons and entities acting directly or indirectly in concert with DEY, Medicare/Medicaid paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs, including those specified in this Section.  The acts committed by  DEY that caused Medicare/Medicaid  to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about prices and costs of the drugs, including those  specified in this Section, which  DEY knew would be utilized by Medicare/Medicaid in paying or approving claims for such drugs and using the inflated Spread created by its false representations of prices and costs as a financial inducement to increase or maintain sales and marketshare of those drugs.   Each of DEY's representations was utilized by Medicare/Medicaid in paying or approving claims for the drugs, including those specified in this Section.

213.   During the entire period of time specified in this section, DEY knowingly caused its false or fraudulent price and cost representations to be reported by Red Book,

125

Blue Book and First DataBank's Automated Services and Medispan and further made or used false records or statements regarding the prices and costs of its drugs, including those specified in this Section and submitted same to the Medicare/Medicaid. DEY made and/or caused to be made approximately 3,367,626 false statements in the form of false or fraudulent price and costs representations to the state Medicaid Programs and the Medicare Program.

214.    By way of example, DEY's price and cost representations for certain of the drugs in question, as reported by DEY are shown in the following chart. In comparison, the amount listed under the Relator's Cost column reflects the actual contract prices that were available to the Relator for the listed drugs.  The column "invoice price to wholesaler" represents the prices listed as invoice prices by one or more major wholesalers such as McKesson or Bergen Brunswig and available to the Relator through catalogs or computer purchasing software.  As a very small infusion pharmacy, the Relator did not receive the lowest prices available to volume purchasers. Accordingly,  in many instances the cost to Providers for the drugs was significantly lower than that paid by the Relator. For Providers that paid less, the Spread on the drugs was  correspondingly greater than the Spread on the same drugs available to the Relator.  A listing of drugs with respect to which DEY knowingly caused Medicare/Medicaid to pay falsely inflated reimbursement amounts by reporting falsely inflated drug costs and prices is contained in **Exhibits "1"**  (Medicaid) **and "2"** (Medicare/Medicaid) attached hereto.  Attached as **Exhibit "9"** is a chart showing DEY's WACs  for certain of the drugs in question.

126

CIVIL ACTION NO. 00 CV10698 MEL

| Year | False "AWP" Reported Through Red Book | Medispan "AWP" | Texas "WEAC" Medicaid Reimbursement Based On False Reported Prices ** | Relator's Cost Contract Price | Invoice Price to Wholesaler |
|------|------|------|------|------|------|
| 1997 | $105.60 | $105.60 | | $43.20 | $64.10 |
| 1998 | $105.60 | $105.60 | | $43.20 | $51.15 |
| 1999 | $105.60 | $105.60 | | $30.60 | $48.25 |
| 2000 | $105.60 | $105.60 | $26.88 | $35.15 | $45.26 |
| 2001 | $105.60 | $105.60 | $40.32 | $20.45 | $37.89 |
| 2002 | $105.60 | $105.60 | | $16.50 | $31.89 |
| 2003 | $105.60 | $105.60 | $26.21 | $15.00 | $25.33 |

Table title: Defendant DEY / IPRATROPIUM BROMIDE / 0.02% 2.5mls, 60s / 49502-0685-60 / HCPCS J7645, J7644

** Amounts contained in the Texas WEAC (Wholesale Estimated Acquisition Cost) reimbursement column also reflect the fact that the Defendant's price and cost representations were falsely inflated. See paragraphs 112 - 114 herein.

215.    As a result of DEY's actions alleged herein, the UNITED STATES has sustained damages, and DEY is liable to the United States for civil penalties and treble damages as provided by False Claims Act.

## SECTION NO. 21



216.

128

## Have Been Completely REDACTED

Which includes the end of Paragraph 216 through Paragraph 283

Pages 128 through 192

CIVIL ACTION NO. 00 CV10698 MEL

284. ████████████████████████████████

████████████████████████████████████████

██████████████████████████

### SECTION NO. 38
### RECOVERY OF STATES' SHARES OF DAMAGES
### TO THE MEDICAID PROGRAM

285.    31 U.S.C. §3732(b) provides that the Court has jurisdiction over claims under state law that arise from the same transactions or occurrence as brought in this False Claims Act case.

286.    Several states have enacted qui tam statutes similar to the federal False Claims Act, including the following:

| STATE | STATUTE |
| --- | --- |
| Arkansas | ARK. CODE ANN. Sec 20-77-901 et seq. (2000). |
| California | CAL. Gov't Code Sec 12650 et seq.(DEERING 2000). |
| Delaware | DEL. CODE. ANN. tit. 6, Sec 1201 et seq. (2000). |
| District of Columbia | D.C. CODE ANN. Sec 1-1188.13 et seq.(2000). |
| Florida | FLA. STAT. 68.081 et seq. (2000) |
| Hawaii | HAW. REV. STAT. Sec 661-22 et seq. (2000). |
| Illinois | 740 ILL. COMP. STAT. ANN. Sec 175/1 et seq. (2000). |
| Louisiana | LA. REV. STAT. ANN. Sec 46:439.1 et seq. (2000). |
| Massachusetts | MASS ANN. LAWS CH. 12, Sec 5(A)-(O) |

CIVIL ACTION NO. 00 CV10698 MEL

| STATE | STATUTE |
|---|---|
| New Mexico | NEW MEXICO MEDICAID FALSE CLAIMS ACT, 46th legislature, second session, 2004, Chapter 49, HOUSE BILL 468, Signed by Governor Effective May 19, 2004. |
| Nevada | NEV. REV. STAT. Sec357.010 et seq. (1999). |
| Tennessee | TENN. CODE. ANN. Sec 71-5-181 et seq. (2000) |
| Texas | TEX. HUM. RES. CODE Sec 36.001-36.117 |
| Utah | UTAH CODE ANN. Sec 26-20-1 et seq. (2000). |
| Virginia | VIRGINIA Code Sec 8.01-216.1 et seq., effective Jan. 1, 2003 |

287. The laws of all states provide for the recovery of sums that the state unlawfully pays.

288. The allegations of this Complaint also state claims for which relief can be granted pursuant to said state statutes.

289. Accordingly, the claims alleged herein also encompass the States' shares of the Medicaid funds at issue, together with such additional damages, penalties and other relief as may be available under applicable law.

194

CIVIL ACTION NO. 00 CV10698 MEL

## COUNT I

### FALSE CLAIMS ACT;
### CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

290.  This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

291.  Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows:

292.  From the dates specified in Sections 15 through 37 to the present date the DEFENDANTS knowingly caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATE GOVERNMENTS false or fraudulent claims for payment or approval, in that the DEFENDANTS caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATE GOVERNMENTS false or fraudulent price and cost information for the specified drugs (as the term "specified drugs" has been defined throughout the Complaint) and caused the UNITED STATES and STATE GOVERNMENTS to pay out sums of money to the Providers and suppliers of the DEFENDANTS' specified drugs, grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

293.  Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Million Dollars ($10,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

195

CIVIL ACTION NO. 00 CV10698 MEL

## COUNT II

### FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT

294. This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

295. Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows:

296. The DEFENDANTS, from the dates specified in Sections 15 through 37, to the present date knowingly [as defined in §3729(b)] caused false records or statements to be made or used to get false or fraudulent claims to be paid or approved by the GOVERNMENT, in that the DEFENDANTS, caused false records or statements of prices and costs of the DEFENDANTS' drugs specified herein to be used by the GOVERNMENT to pay or approve claims presented by the Providers and suppliers of the DEFENDANTS' specified drugs, which claims were grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

297. This court also applies with respect to the REBATE DEFENDANTS and their false quarterly submissions to CMS in connection with the Medicaid Rebate Program and as explained in Section 10 herein.

298. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Million Dollars ($10,000,000.00), all in violation of 31 U.S.C. §3729(a)(2).

196

CIVIL ACTION NO. 00 CV10698 MEL

## **COUNT III**

### **FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT**

299.  This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

300.  Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows:

301.  The DEFENDANTS, from on or before the dates specified in Sections 15 through 37,  to the present date knowingly [as defined in §3729(b)] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the DEFENDANTS knew that the UNITED STATES' Medicare Program and the States' Medicaid Programs had used the DEFENDANTS' false price and cost representations for purposes of paying or approving claims of the Providers and suppliers of the DEFENDANTS' specified drugs; the DEFENDANTS  knew that sums of money paid by the UNITED STATES and States' Governments to the Providers and suppliers of the DEFENDANTS' specified drugs were grossly in excess of the amounts permitted by law; the DEFENDANTS knew it was the obligation of the UNITED STATES Medicare Part B carriers and State Governments to recoup governments' funds paid in excess of the amounts permitted by law; the DEFENDANTS, nevertheless, continued to conceal the fact that they had caused to be made or used false records or statements of prices and costs  for the specified drugs  that were grossly in  excess of the reasonable

197

CIVIL ACTION NO. 00 CV10698 MEL

amounts permitted by law and to conceal from the GOVERNMENT an obligation to pay to the GOVERNMENT the excessive reimbursement amounts paid to Providers for which DEFENDANTS were directly responsible.

302.    This court also applies with respect to the REBATE DEFENDANTS and their false quarterly submissions to CMS in connection with the Medicaid Rebate Program and as explained in Section 10 herein.

303.    Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(7).

## COUNT IV

### FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATION

304.    This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

305.    Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows:

306.    The DEFENDANTS, from the dates specified in Sections 15 through 37, to the present date knew that the prices charged to their customers for the specified drugs were significantly reduced in amount from the prices and costs represented by the DEFENDANTS and upon which the DEFENDANTS knew Medicare and Medicaid claims would be approved and paid. Accordingly, the DEFENDANTS have each knowingly

198

CIVIL ACTION NO. 00 CV10698 MEL

offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers in the form of price reductions and/or in the form of illegal remuneration from the Medicare and/or States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified drugs for which the DEFENDANTS knew that payment would be made, in whole or in part, by the Medicare and States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b) and 18 U.S.C §2.

307.  The DEFENDANTS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately represent the remuneration in the claims, caused the claims for the specified drugs to be false and fraudulent claims and caused the claims to be presented to the Medicare and States' Medicaid Programs for payment and approval in violation of 31 U.S.C §3729(a)(1).

308.  Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of Ten Million Dollars ($1,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(1).

309.  The DEFENDANTS' knowing actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C.§1320a-7b(b)(2), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately represent the remuneration in the claims, caused the claims for the specified

CIVIL ACTION NO. 00 CV10698 MEL

drugs to be false records or statements that were made and used to get a false or fraudulent claim paid or approved by the Government. The DEFENDANTS' actions herein caused said false records or statements to be made and used as prohibited by 31 U.S.C. §3729(a)(2).

310.   Because of the DEFENDANTS' conduct as set forth in this Count, the United States suffered actual damages in excess of Ten Million Dollars ($10,000,000.00) all in violation of 31 U.S.C. §3729(a)(2).

## COUNT V

### FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS

311.   This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

312.   Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows:

313.   The DEFENDANTS, from the dates specified in Sections 15 through 37 to the present date knowingly presented or caused to be presented, prohibited claims or bills to individuals and other entities for designated health services [outpatient prescription drugs] furnished pursuant to prohibited referrals from physicians, physician groups and/or outpatient clinics with which the DEFENDANTS had financial relationships, for which the DEFENDANTS knew that payment would be made, in whole or in part, by the Medicare

200

and/or States' Medicaid Programs.    Such prohibited referrals, claims, bills and compensation arrangements are specifically prohibited by 42 U.S.C. §1395nn and 18 U.S.C.

314.    The DEFENDANTS knowingly made or used or caused their referring physicians, physician groups or outpatient clinics to make or use false records or statements to get false or fraudulent claims and bills for the DEFENDANTS' outpatient prescription drugs to be paid or approved by the Medicare and/or States' Medicaid Programs.

315.    The DEFENDANTS' knowing presentment or causing others to present, claims or bills to Medicare and/or the States' Medicaid Programs in violation of 42 U.S.C. §1395nn(a)(1)(B) without disclosing facts revealing said violations constituted the making or using, or the causing others to make or use, false records or statements to get false or fraudulent claims paid or approved by the GOVERNMENT in violation of 31 U.S.C. §3729(a)(2).

316.    Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00) all in violation of 31 U.S.C. §3729(a)(2).

CIVIL ACTION NO. 00 CV10698 MEL

## COUNT VI

### FALSE CLAIMS ACT; CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID; J-CODE/PHYSICIAN SERVICES

317.   This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

318.   Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows.

319.   This Count pertains to all DEFENDANTS manufacturing specified drugs that were multiple-source drugs subject to the "J Code" Medicare reimbursement methodology described herein (for purposes of this Count each such drug is hereinafter referred to as "a J Code drug"). Each DEFENDANT that reported a falsely inflated AWP for a J Code drug is jointly and severally liable, along with all other DEFENDANTS who reported a falsely inflated AWP for a J Code drug falling under the same HCPCS code, for the sum of all falsely inflated reimbursement amounts paid under that HCPCS code.

320.   With respect to State Medicaid Programs, this Count also applies to all DEFENDANTS manufacturing specified drugs that: 1) were multiple-source drugs, 2) were subject to a State Medicaid reimbursement methodology similar to the Medicare "J Code" methodology described herein, and 3) had an AWP or other reported price or cost that was falsely inflated, if that price or cost was used in creating an array of prices or costs from which one was selected as the reimbursement amount for all versions of a specified drug.

202

321.  Each DEFENDANT'S liability under this Count for damages to Medicare extends from the time it first reported a falsely inflated AWP until such time, if any, when it stopped reporting a falsely inflated AWP.

322.  Each DEFENDANT's liability under this Count for damages to Medicaid extends from the time it first reported a falsely inflated AWP or other price or cost used in creating an array of prices or costs from which one was selected for reimbursement purposes until such time, if any, when it stopped reporting such falsely inflated prices or costs.

323.  Each DEFENDANT, fully aware of its actions and with the intent to defraud:

a)  shared in the conspiratorial objective of inflating Medicare and, in the case of physician services, Medicaid reimbursement for the specified drugs;

b)  acted in concert with one another by reporting falsely inflated AWPs and other prices and costs for the specified drugs;

c)  reported falsely inflated AWPs and other prices and costs that did not represent the prices generally and currently available in the marketplace, to further the objective of fraudulently increasing Medicare and, in the case of physician services, Medicaid reimbursement;

203

CIVIL ACTION NO. 00 CV10698 MEL

d)      caused the submission of false claims for reimbursement for the specified drugs based on the falsely inflated AWPs and other prices and costs reported; and

e)      caused the Government to approve and pay claims for the specified drugs based on the falsely inflated AWPs and other prices and costs at amounts that greatly exceeded the prices generally and currently available in the marketplace, resulting in great financial loss to the Government.

324.    Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Million Dollars ($1,000,000), all in violation of 31 U.S.C. §3729(a)(3).


## COUNT VII

### FALSE CLAIMS ACT; CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID; HUB AND SPOKE CONSPIRACY

325.    This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

326.    Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein and further alleges as follows.

327.    This Count pertains to all DEFENDANTS manufacturing specified drugs.

328. Each DEFENDANT'S liability under this Count for damages to Medicare extends from the time it first reported a falsely inflated AWP until such time, if any, when it stopped reporting a falsely inflated AWP.

329. Each DEFENDANT's liability under this Count for damages to Medicaid extends from the time it first reported a falsely inflated AWP or other price or cost used in creating an array of prices or costs from which one was selected for reimbursement purposes until such time, if any, when it stopped reporting such falsely inflated prices or costs.

330. Each DEFENDANT conspired with each other and with non-party co-conspirators, including First Databank. Medi-Span and Red Book, and specified wholesalers, distributors and GPOs, to inflate Medicare and Medicaid reimbursement for the specified drugs in order to increase market share and sales of those drugs.

331. Non-party co-conspirators First DataBank, Medi-Span and Red Book acted in concert with each DEFENDANT to publish inflated price and cost information used by Medicare and Medicaid notwithstanding its false and misleading nature, knowing that each DEFENDANT was reporting the false price and cost information to compete with one or more other DEFENDANTS.

332. First DataBank, Medi-Span and Red Book thus acted as essential "hubs" by agreeing with each DEFENDANT (the "spokes") separately to publish the false and misleading price and cost information that was essential to the fraudulent and misleading

205

CIVIL ACTION NO. 00 CV10698 MEL

means of competition that each DEFENDANT had elected to engage in, as described supra, Sections 4, 5, 9, 10 and 12.

333.   The specified wholesalers, distributors and GPOs entered into agreements with and acted in concert with each DEFENDANT to conceal from Medicare and Medicaid the prices generally and currently available in the marketplace for the specified drugs, knowing that each DEFENDANT, to compete with one or more other DEFENDANTS, was reporting to First DataBank, Red Book and Medi-Span false price and cost information for those drugs and concealing from Medicare and Medicaid the prices and costs generally and currently available in the marketplace for those drugs.

334.   The specified wholesalers, distributors and GPOs thus acted as essential "hubs" by agreeing with each DEFENDANT (the "spokes") separately to conceal from Medicare and Medicaid the prices and costs generally and currently available in the marketplace for the specified drugs, which was essential to the fraudulent and misleading means of competition that each DEFENDANT had elected to engage in.

335.   Each DEFENDANT and non-party co-conspirator, fully aware of its actions and with the intent to defraud:

> a)     shared in the conspiratorial objective of inflating Medicare and Medicaid reimbursement for the specified drugs;
>
> b)     acted in concert with one another by reporting and publishing falsely inflated prices, including AWPs and WACs, and concealing prices and costs generally and currently available for the specified drugs;

206

Case 1:05-cv-11084-PBS    Document 180-6    Filed 08/17/2006    Page 14 of 14

CIVIL ACTION NO. 00 CV10698 MEL

c)    reported and published falsely inflated prices, including AWPs and WACs, that did not represent the prices generally and currently available in the marketplace, and concealed prices and costs generally and currently available in the marketplace, to further the objective of fraudulently increasing Medicare and Medicaid reimbursement;

d)    caused the submission of claims for reimbursement for the specified drugs based on the falsely inflated prices, including AWPs and WACs, reported and published; and

e)    caused the Government to approve and pay claims for the specified drugs based on the falsely inflated prices, including AWPs and WACs, at amounts that greatly exceeded the prices generally and currently available in the marketplace, resulting in great financial loss to the Government.

336.    Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Million Dollars ($1,000,000), all in violation of 31 U.S.C. §3729(a)(3).

207

CIVIL ACTION NO. 00 CV10698 MEL

# PAGES 208 THROUGH 211

# HAVE BEEN COMPLETELY REDACTED

# WHICH INCLUDES PARAGRAPHS

# 337 THROUGH 346

CIVIL ACTION NO. 00 CV10698 MEL

## COUNT X

### FALSE CLAIMS ACT; FALSE CLAIMS UNDER STATE LAW ARISING FROM SAME TRANSACTION OR OCCURRENCE AS BROUGHT IN THIS FALSE CLAIMS ACTION

347.    This is a claim under the False Claims Act, 31 U.S.C. §§3729-3733, as amended.

348.    Relator realleges and incorporates by reference paragraphs 1 through 289 as if fully set forth herein, realleges Counts I through IX and further alleges as follows.

349.    This Count pertains to all DEFENDANTS.

350.    Each DEFENDANT's liability under this Count for damages to Medicaid extends from the time it first reported a falsely inflated AWP or other price or cost used for reimbursement purposes until such time, if any, when it stopped reporting such falsely inflated prices or costs.

351.    The allegations and claims against each DEFENDANT in this Complaint also state claims for which relief maybe granted pursuant to state statutes.

352.    31 U.S.C. §3732(b) provides that the Court has jurisdiction over claims under state law that arise from the same transactions or occurrences at issue in Counts I through IX in this False Claims Act case

353.    Accordingly, the claims alleged in Counts I through IX also encompass the States' shares of the Medicaid funds at issue, together with such additional damages, penalties and other relief as may be available under applicable law.

212

CIVIL ACTION NO. 00 CV10698 MEL

354. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED

STATES suffered actual damages recoverable under state statutes in excess of One Million

Dollars ($1,000,000), all in violation of 31 U.S.C. §3729(a)(3).

## REQUESTS FOR RELIEF

355. WHEREFORE, the Relator, on behalf of the UNITED STATES, demands that

judgment be entered in its favor and against DEFENDANTS: ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████DEY, INC.; ████████████

████EM PHARMA, INC.; EMD PHARMACEUTICALS, INC.; ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████LIPHA, S.A.; ████████████████████MERCK-LIPHA, S.A.; MERCK

KGaA; ████████████████████████████████████

████████████████████████████████████████

213

CIVIL ACTION NO. 00 CV10698 MEL



with judgment to be entered against each DEFENDANT for the amount of damages: (1) to the States' Medicaid Programs arising (a) from claims for each DEFENDANT'S respective specified drugs and (b) jointly and severally with such other Defendants for damages as set forth in paragraphs 134 through 136 herein; and (2) to the Medicare Program arising from claims for those drugs classified under the HCPCS codes covering their specified drugs, and jointly and severally with such other Defendants whose drugs fall under said HCPCS codes, as follows:

356. On Count I (False Claims Act; Causing Presentation of False or Fraudulent Claims) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false claim;

357. On Count II (False Claims Act; Causing a False Record or Statement To Be Made or Used to get a False or Fraudulent Claim Paid or Approved by the Government) for triple the amount of UNITED STATES' damages plus civil penalties of no more than

214

CIVIL ACTION NO. 00 CV10698 MEL

ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false statement;

358.   On Count III (False Claims Act; Causing False Records Or Statements To Be Used To Conceal An Obligation To Pay Money To The Government) for triple the amount of the UNITED STATES' damages plus civil penalties of no more than ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false or fraudulent claim paid;

359.   On Count IV (False Claims Act; Causing Presentation of False or Fraudulent Claims; Causing a False Record or Statement to be Made or Used to Get a False or Fraudulent Claim Paid or Approved by the Government; Illegal Remuneration) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false claim;

360.   On Count V (False Claims Act; Causing Presentation Of False or Fraudulent Claims; Prohibited Referrals, Claims and Compensation Arrangements) for triple the amount of the UNITED STATES' damages, plus civil penalties of no more than ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false statement;

361.   On Count VI (False Claims Act; Conspiring To Defraud The Government By Getting A False Or Fraudulent Claim Allowed Or Paid; J-Code/Physician Services) for triple the amount of the UNITED STATES' and States' damages, plus civil penalties of no more

215

CIVIL ACTION NO. 00 CV10698 MEL

than ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false record or statement.

    362.   On Count VII (False Claims Act; Conspiring To Defraud The Government By Getting A False Or Fraudulent Claim Allowed Or Paid; Hub and Spoke Conspiracy) for triple the amount of the UNITED STATES' and States' damages, plus civil penalties of no more than ELEVEN THOUSAND DOLLARS ($11,000.00) and no less than FIVE THOUSAND FIVE HUNDRED DOLLARS ($5,500.00) for each false record or statement.

216

CIVIL ACTION NO. 00 CV10698 MEL

365.    On Count X (False Claims Act; False Claims Under State Law Arising From Same Transaction or Occurrence as Brought in This False Claims Action) for damages encompassing the States' shares of the Medicaid funds at issue, together with such additional damages, penalties and other relief as may be available under applicable law for each false record or statement.

Further, the Relator, on its behalf, requests that it receive the maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that its award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

217

CIVIL ACTION NO. 00 CV10698 MEL

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: _February 15_, 2005

Respectfully submitted,
Attorneys for
the Private Person Plaintiff,
Ven-A-Care of the Florida Keys, Inc.

Jonathan Shapiro
BBO No. 454220
Stern, Shapiro, Weissberg & Garin
90 Canal Street
Boston, MA 02114-2022
617-742-5800

THE BREEN LAW FIRM
James J. Breen
Florida Bar No. 297178
Alison W. Simon
Florida Bar No: 0109568
P. O. Box 297470
Pembroke Pines, FL 33029
Phone: 954-874-1635
Fax: 954-874-1705

Attorneys for the United States
of America by and through
Ven-A-Care of the Florida
Keys, Inc., the Relator

BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Gary L. Azorsky
Susan S. Thomas
Jeanne A. Markey
Joy Clairmont
1622 Locust Street
Philadelphia, PA 19103
Phone: 215-875-3000

GOODE, CASSEB, JONES,
RIKLIN, CHOATE & WATSON
John E. Clark
2122 North Main Avenue
San Antonio, Texas 78212-9680
Phone: 512-733-6030

218

CIVIL ACTION NO. 00 CV10698 MEL

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _15ᵗʰ_ day of _February_, 2005, I caused an original and a copy of this Third Amended Complaint to be filed under seal and in camera for sixty (60) days and not to be served on the Defendants named herein or until further order of this Honorable Court.

I HEREBY CERTIFY that prior to this _15ᵗʰ_ day of _February_, 2005, I caused a copy of this Third Amended Cornplaint and written disclosure of substantially all material evidence and information the Relator, VEN-A-CARE possesses to be served on the Government pursuant to Rule 4(i)(1)(A) and (B), Fed.R.Civ.P., prior to the filing of this Third Amended Complaint by delivering a copy of the Third Amended Complaint, material evidence and information to the United States Attorney for the District of Massachusetts, and by sending a copy of the Third Amended Complaint, material evidence and information by Certified Mail, Return Receipt Requested, to the Attorney General of the United States in Washington, D.C.

Jonathan Shapiro

C:\Documents and Settings\Jim Breen\My Documents\BOSTON\3rdAmended\FINAL-Complaint-Pkg\Bos-3rd-Amd-Cmp-Final.wpd

219

# EXHIBITS

**EXHIBIT "1"**
**PRICE FRAUD DRUGS**
**BILLED THROUGH MEDICAID**
Volume 1 - page 1

EXHIBIT "1", VOLUME 1 - PAGES 1 THROUGH 25

HAVE BEEN TOTALLY REDACTED

# EXHIBIT "1"
# PRICE FRAUD DRUGS
# BILLED THROUGH MEDICAID
Volume 1 - page 26

| Defendant | Drug | NDC # | Type of Drug |
|---|---|---|---|
| ██████ | ████ | ████████ | ██ |
| ██████ | ████ | ████████ | ██ |
| ██████ | ██████ | ████████ | ██ |
| ██████ | ████ | ████████ | ██ |
| ██████ | ██████ | ████████ | ██ |
| ██████ | ████ | ████████ | ██ |
| ██████ | ████ | ████████ | ██ |
| ██████ | ████ | ████████ | ██ |
| | | | |
| Dey | Albuterol Inhalation Aerosol (refill) 17 gm | 49502-0303-27 | Inhalation |
| Dey | Albuterol Inhalation Aerosol 17 gm (90 mcg Aerosol Inhaler) | 49502-0303-17 49502-0333-17 | Inhalation |
| Dey | Albuterol Sulfate multi dose bottle | 49502-0105-01 | Inhalation |
| | | | |
| ██████ | ████████ | ████████ | ██████ |
| ██████ | ██████ | ████████ | ██████ |
| ██████ | ██████ | ████████ | ██████ |
| ██████ | ██████ | ████████ | ██████ |
| ██████ | ██████ | ████████ | ██████ |
| ██████ | ██████ | ████████ | ██████ |

EXHIBIT "1", VOLUME 1 - PAGES 27 THROUGH 85

HAVE BEEN TOTALLY REDACTED

============================

EXHIBIT "1", VOLUME 2 - PAGES 1 THROUGH 124

HAVE BEEN TOTALLY REDACTED

============================

EXHIBIT "1", VOLUME 3 - PAGES 1 THROUGH 52

HAVE BEEN TOTALLY REDACTED

C:\Documents and Settings\Jim Breen\My Documents\Defendants\Dey\Bos3-Exh1-Dey.wpd

**EXHIBIT "2"**
**PRICE FRAUD DRUGS**
**BILLED THROUGH MEDICARE AND MEDICAID**
**Page 1**

| Defendant | Drug | NDC # | Type of Drug | HCPCS Code |
|-----------|------|-------|--------------|------------|
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ███ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ██ | ██ |
| ██ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ███ | ██ |
| ██ | ███ | ███ | ██ | ██ |
| ██ | ███ | ███ | ██ | ██ |

**EXHIBIT "2"**
**PRICE FRAUD DRUGS**
**BILLED THROUGH MEDICARE AND MEDICAID**
**Page 2**

| Defendant | Drug | NDC # | Type of Drug | HCPCS Code |
|---|---|---|---|---|
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| Dey | Ipratropium Bromide 0.02 % 2.5, ml 25's | 49502-0685-03 | Inhalation | J7644 J7645 |
| Dey | Ipratropium Bromide unit dose | 49502-0685-33 | Inhalation | J7644 J7645 |
| Dey | Ipratropium Bromide 0.02% 2.5 ml, 60's | 49502-0685-60 | Inhalation | J7644 J7645 |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ |

**EXHIBIT "2"**
<u>**PRICE FRAUD DRUGS**</u>
**BILLED THROUGH MEDICARE AND MEDICAID**
**Page 3**

# PAGES 3 THROUGH 5 OF EXHIBIT "2"

# HAVE BEEN COMPLETELY REDACTED

C:\Documents and Settings\Jim Breen\My Documents\Defendants\Dey\Bos3-Exh2-Dey.wpd

COMPOSITE EXHIBIT "3"

# Medicaid Prescription Reimbursement Information by State - Qtr Ending September 2004

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% then AWP-10% | $5.40 | $.50-$3.00* | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | AWP-15% | $2.00 (FFS only) | none | No |
| Arkansas | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00* | Yes |
| California | AWP-10% | $4.05 | $1.00 | Yes |
| Colorado | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharmacy); $1.89 (insitutional pharmacy) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-40% (generic); AWP-12% (brand) | $3.60 | $1.00 | Yes |
| Delaware | AWP-14% (traditional - retail independent & retail chain pharmacies); AWP-16% (non-traditional - long term care & specialty pharmacies) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | Lower of AWP-13.25% or WAC+7% | $4.23; $4.73 (NH-long term care) | 2.5% of payment up to $300 | Yes |
| Georgia | AWP-10% | $4.63 (brand for profit pharm); $4.33 (brand not for profit); $5.13 (generic for profit pharm); $4.63 (generic not for profit) | $.50 (generic); $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | AWP-25% (generic); AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $0.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $3.00 | Yes |
| Iowa | AWP-12% | $4.26 | $1.00 | Yes |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisiana | AWP-13.5% (AWP-15% for chains) | $5.77 | $.50-$3.00* | Yes |
| Maine | AWP-15%; direct supply drug list=usual & customary charge or AWP-17% plus $3.35 professional fee or FUL or MAC plus $3.35 professional fee (Mail order lowest of usual & customary charge, AWP-20% plus $1.00 professional fee-for exceptions see State plan, FUL or MAC plus $1.00 professional fee) | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $2.50 (generic & brand) (not to exceed $25 per mo.) (Mail order not subject to co-pay) $3 per day RHC (max of $30 per mo, per individual) | Yes |
| Maryland | Lower of AWP-12% or WAC+8%, direct price+8% or distributor price when available | $4.69 (generic); $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25 (home IV therapy) | $2.00 | Yes |

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $1.00 (multi-source & non-legend OTC); $3.00 (non-exempt) | Yes |
| Michigan | AWP-13.5% (independ pharm (1-4 stores)); AWP-15.1% (chain (5+ stores)) | $3.77 | $1.00 | Yes |
| Minnesota | AWP-11% | $3.65 | none | Yes |
| Mississippi | AWP-12% | $3.91; allows for a reasonable dispensing fee for OTC | $1.00 (generic); $2.00 (preferred brand); $3.00 (brand) | No |
| Missouri | Lower of AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00* | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |
| New Hampshire | AWP-16% | $1.75 | $1.00 (generic); $2.00 (brand & compound) | Yes |
| New Jersey | AWP-12.5% | $3.73; $4.07 (instit services) | none | No |
| New Mexico | AWP-14% | $3.65 | none | Yes |
| New York | AWP-12% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $2.00 (brand) | No |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| North Dakota | AWP-10% | $5.60 (generic); $4.60 (brand) | $3.00 (brand) | No |
| Ohio | Lower of WAC+9% or AWP-12.8% | $3.70 | $3.00 (if not on PDL) | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00* | Yes |
| Oregon | AWP-11% (institutional), AWP-15% (noninstitutional) | $3.50 (retail); $3.91 (instiutional) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | $1.00 | No |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | none | No |
| South Carolina | AWP-10% | $4.05 (independ pharm); $3.15 (institutional) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($5.55 for unit dose) | $2.00 | Yes |
| Tennessee | AWP-13% | $2.50 (long term care dual eligib); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | Lower of AWP-15% or WAC+12% | $5.14 | None | Yes |
| Utah | AWP-15% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00* | Yes |
| Virginia | AWP-10.25% | $3.75; $5.00 (unit dose drugs) | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (w/2-4 manufact)), AWP-50% (multiple source from 5+ manufact), AWP-19% (brand-mail order), AWP-15% (generic-mail order) | $4.20-$5.20 (based on 3-tiered pharmacy volume); $3.25 (mail order) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$3.00* | No |

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $3.00 (brand); $1.00 (generic) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

REVISED 6/29/04

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, NH=nursing home)
*Co-pay varies by cost of prescription.
SOURCE: CMS Approved State Plans

## Medicaid Prescription Reimbursement Information by State - Qtr Ending June 2004

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% then AWP-10% | $5.40 | $.50-$3.00* | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | | $2.00 (FFS only) | | No |
| Arkansas | AWP-15% | | none | Yes |
| California | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00* | Yes |
| Colorado | AWP-10% | $4.05 | $1.00 | Yes |
| | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharmacy); $1.89 (institutional pharmacy) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-40% (generic); AWP-12% (brand) | $3.60 | $1.00 | Yes |
| Delaware | AWP-14% (traditional - retail independent & retail chain pharmacies); AWP-16% (non-traditional - long term care & speciality pharmacies) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | Lower of AWP-13.25% or WAC+7% | $4.23; $4.73 (NH-long term care) | 2.5% of payment up to $300 | Yes |
| Georgia | AWP-10% | $4.63 (brand for profit pharm); $4.33 (brand not for profit); $5.13 (generic for profit pharm); $4.63 (generic not for profit) | $.50 (generic; $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | AWP-25% (generic); AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $0.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $3.00 | Yes |
| Iowa | AWP-12% | $4.26 | $1.00 | Yes |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisiana | AWP-13.5% (AWP-15% (for chains) | $5.77 | $.50-$3.00* | Yes |
| Maine | AWP-15%, direct supply drug list-usualy & customary charge or AWP-17% plus $3.35 professional fee or FUL or MAC plus $3.35 professional fee | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $2.50 (generic & brand) (not to exceed $25 per mo.) (Mail order not subject to co-pay) $3 per day RHC (max of $30 per mo., per individual) | Yes |
| Maryland | Lower of AWP-12% or WAC+8%, direct price+8% or distributor price when available | $4.69 (generic); $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25-(home IV therapy) | $2.00 | Yes |
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $1.00 (multi-source & non-legend OTC); $3.00 (non-exempt) | Yes |
| Michigan | AWP-13.5% (independ pharm (1-4 stores)); AWP-15.1% (chain (5+ stores)) | $3.77 | $1.00 | Yes |

| State | Formula | Dispensing fee | Co-pay | CMS Approved |
|---|---|---|---|---|
| Minnesota | AWP-11% | $3.65 | none | Yes |
| Mississippi | AWP-12% | $3.91; allows for a reasonable dispensing fee for OTC | $1.00 (generic); $2.00 (preferred brand); $3.00 (brand) | No |
| Missouri | Lower of AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00* | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |
| New Hampshire | AWP-16% | $1.75 | $1.00 (generic); $2.00 (brand & compound) | Yes |
| New Jersey | AWP-12.5% | $3.73; $4.07 (add'l services) | none | No |
| New Mexico | AWP-12.5% | $3.65 | none | No |
| New York | AWP-12% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $3.00 (brand) | Yes |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | No |
| North Dakota | AWP-10% | $5.60 (generic); $4.60 (brand) | $3.00 (brand) | Yes |
| Ohio | Lower of WAC+9% or AWP-12.8% | $3.70 | $3.00 (if not on PDL) | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00* | Yes |
| Oregon | AWP-11% (institutional), AWP-15% (noninstitutional) | $3.50 (retail); $3.91 (institutional) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | $1.00 | No |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | none | No |
| South Carolina | AWP-10% | $4.05 (independ pharm); $3.15 (institutional) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($5.55 for unit dose) | $2.00 | Yes |
| Tennessee | AWP-13% | $2.50 (long term care dual eligb); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | Lower of AWP-15% or WAC+12% | $5.14 | None | Yes |
| Utah | AWP-15% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00* | Yes |
| Virginia | AWP-10.25% | $3.75; $5.00 (unit dose drugs) | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (w/2-4 manuf/act)), AWP-50% (multiple source from 5+ manuf/act), AWP-19% (brand-mail order), AWP-15% (generic-mail order) | $4.20-$5.20 (based on 3-tiered pharmacy volume); $3.25 (mail order) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$3.00* | No |
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $3.00 (brand); $1.00 (generic) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, NH=nursing home)
*Co-pay varies by cost of prescription.
SOURCE: CMS Approved State Plans

REVISED 6/29/04

## Medicaid Prescription Reimbursement Information by State - Qtr Ending March 2004

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% then AWP-10% | $5.40 | $.50-$3.00* | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | AWP-15% | $2.00 (FFS only) | none | No |
| Arkansas | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00* | Yes |
| California | AWP-5% | $4.05 | $1.00 | Yes |
| Colorado | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharmacy); $1.89 (institutional pharmacy) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-40% (generic); AWP-12% (brand) | $3.60 | $1.00 | Yes |
| Delaware | AWP-14% (traditional - retail independent & retail chain pharmacies); AWP-16% (non-traditional - long term care & speciality pharmacies) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | Lower of AWP-13.25% or WAC+7% | $4.23; $4.73 (NH-long term care) | 2.5% of payment up to $300 | Yes |
| Georgia | AWP-10% | $4.63 (brand for profit pharm); $4.33 (brand not for profit); $5.13 (generic for profit pharm); $4.63 (generic not for profit); | $.50 (generic); $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | AWP-25% (generic); AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $0.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $.50-$3.00* | Yes |
| Iowa | AWP-12% | $4.26 | $1.00 | Yes |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisana | AWP-13.5% (AWP-15% for chains) | $5.77 | $.50-$3.00* | Yes |
| Maine | AWP-13% | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $2.50 (generic & brand) (not to exceed $25 per mo.) (Mail order not subject to co-pay) $3 per day RHC (max of $30 per mo., per individual) | Yes |
| Maryland | Lower of AWP-10% or WAC+10%, direct price+10% or distributor price when available | $4.69 (generic) $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25 (home IV therapy) | $2.00 | Yes |
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $2.00 | Yes |
| Michigan | AWP-13.5% (independ pharm (1-4 stores)); AWP-15.1% (chain (5+ stores)) | $3.77 | $1.00 | Yes |

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Minnesota | AWP-11% | $3.65 | none | Yes |
| Mississippi | AWP-12% | $3.91; allows for a reasonable dispensing fee for OTC | $1.00 (generic); $2.00 (preferred brand); $3.00 (brand) | No |
| Missouri | Lower of AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00* | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |
| New Hampshire | AWP-12% | $2.50 | $.50 (generic); $1.00 (brand) | Yes |
| New Jersey | AWP-10% | $3.73; $4.07 (add'l services) | none | No |
| New Mexico | AWP-12.5% | $3.65 | none | No |
| New York | AWP-12% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $2.00 (brand) | Yes |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| North Dakota | AWP-10% | $5.60 (generic); $4.60 (brand) | $3.00 (generic) | No |
| Ohio | Lower of WAC+9% or AWP-12.8% | $3.70 | $3.00 (if not on PDL) | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00* | Yes |
| Oregon | AWP-11% (institutional), AWP-15% (noninstitutional) | $3.50 (retail); $3.91 (institutional) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | $1.00 | No |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | none | No |
| South Carolina | AWP-10% | $4.05 (independ pharm); $3.15 (institutional) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($5.55 for unit dose) | $2.00 | Yes |
| Tennessee | AWP-13% | $2.50 (long term care dual eligib); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | Lower of AWP-15% or WAC+12% | $5.14 | None | Yes |
| Utah | AWP-15% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00* | Yes |
| Virginia | AWP-10.25% | $3.75; $5.00 (unit dose drugs) | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (w/2-4 manufact)). AWP-50% (multiple source from 5+ manufact); AWP-19% (brand-mail order), AWP-15% (generic-mail order) | $4.20-$5.20 (based on 3-tiered pharmacy volume); $3.25 (mail order) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$3.00* | No |
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $3.00 (brand); $1.00 (generic) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, NH=nursing home)
*Co-pay varies by cost of prescription.

REVISED 3/22/04

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|-------|-----------------|----------------|--------|-----------|
| | | | | |

SOURCE: CMS Approved State Plans

# Medicaid Prescription Reimbursement Information by State - Qtr Ending December 2003

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% then AWP-10% | $5.40 | $.50-$3.00* | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | AWP-15% | $2.00 (FFS only) | none | No |
| Arkansas | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00* | Yes |
| California | AWP-5% | $4.05 | $1.00 | Yes |
| Colorado | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharmacy); $1.89 (institutional pharmacy) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-40% (generic); AWP-12% (brand) | $3.60 | $1.00 | Yes |
| Delaware | AWP-14% (traditional - retail independent & retail chain pharmacies); AWP-16% (non-traditional - long term care & speciality pharmacies) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | Lower of AWP-13.25% or WAC+7% | $4.23; $4.73 (NH-long term care) | 25% of payment up to $300 | Yes |
| Georgia | AWP-10% | $4.63 (brand for profit pharm); $4.33 (brand not for profit); $5.13 (generic for profit pharm); $4.63 (generic not for profit) | $.50 (generic); $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | Lower of AWP-25% (generic) or AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $0.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $.50-$3.00* | Yes |
| Iowa | AWP-10% | $5.17 | $1.00 | Yes |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisiana | AWP-13.5% (AWP-15% for chains) | $5.77 | $.50-$3.00* | Yes |
| Maine | AWP-13% | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $.50-$3.00* | Yes |
| Maryland | Lower of AWP-10% or WAC+10%, direct price+10% or distributor price when available | $4.69 (generic); $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25 (home IV therapy) | $2.00 | Yes |
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $2.00 | Yes |
| Michigan | AWP-13.5% (independ pharm (1-4 stores)); AWP-15.1% (chain (5+ stores)) | $3.77 | $1.00 | Yes |
| Minnesota | AWP-14% | $3.65 | none | Yes |
| Mississippi | AWP-12% | $3.91 | $1.00 (generic); $2.00 (brand) | No |

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Missouri | Lower of AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00* | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |
| New Hampshire | AWP-12% | $2.50 | $.50 (generic); $1.00 (brand) | Yes |
| New Jersey | AWP-10% | $3.73; $4.07 (addt'l services) | none | No |
| New Mexico | AWP-12.5% | $3.65 | none | Yes |
| New York | AWP-10% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $2.00 (brand) | No |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| North Dakota | AWP-10% | $5.60 (generic); $4.60 (brand) | $3.00 (brand) | No |
| Ohio | Lower of WAC+9% or AWP-12.8% | $3.70 | none | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00* | Yes |
| Oregon | AWP-11% (institutional), AWP-15% (noninstitutional) | $3.50 (retail); $3.91 (institutional) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | $1.00 | No |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | none | No |
| South Carolina | AWP-10% | $4.05 (independ pharm); $3.15 (institutional) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($5.55 for unit dose) | $2.00 | Yes |
| Tennessee | AWP-13% | $2.50 (long term care dual eligib); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | AWP-15% or WAC+12% (whichever is lowest) | $5.27 | None | Yes |
| Utah | AWP-15% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00* | Yes |
| Virginia | AWP-10.25% | $4.25 | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (w/2-4 manufact)), AWP-50% (multiple source from 5+ manufact), AWP-19% (brand-mail order), AWP-15% (generic-mail order) | $4.20-$5.20 (based on 3-tiered pharmacy volume); $3.25 (mail order) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$3.00* | No |
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $1.00 (legend) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

REVISED 1/12/04

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, NH=nursing home.)
*Variation in co-pay amounts is due to the cost of the prescription.
SOURCE: CMS Approved State Plans

# Medicaid Prescription Reimbursement Information by State - Qtr Ending September 2003

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% (1st); AWP-10% (2nd) | $5.40 | $.50-$3.00* | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | AWP-15% | $2.00 (FFS only) | none | No |
| Arkansas | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00* | Yes |
| California | AWP-5% | $4.05 | $1.00 | Yes |
| Colorado | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharmacy); $1.89 (institutional pharmacy) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-40% (generic); AWP-12% | $3.60 | $1.00 | Yes |
| Delaware | AWP-14% (traditional), AWP-16% (non-traditional) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | Lower of AWP-13.25% or WAC+7% | $4.23, $4.73 (NH-long term care) | none | Yes |
| Georgia | AWP-10% | $4.63 (for profit pharm); $4.33 (not for profit); $.50 (generic incentive) | $.50 (generic); $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | Lower of AWP-25% (generic) or AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $.50-$3.00* | Yes |
| Iowa | AWP-10% | $5.17 | $1.00 | Yes |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisiana | AWP-13.5% (AWP-15% for chains) | $5.77 | $.50-$3.00* | Yes |
| Maine | AWP-13% | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $.50-$3.00* | Yes |
| Maryland | Lower of AWP-10% or WAC+10%, direct price+10% or distributor price when available | $4.69 (generic); $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25 (home IV therapy) | $2.00 | Yes |
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $2.00 | Yes |
| Michigan | AWP-13.5% (1-4 stores), AWP-15.1% (5+ stores) | $3.77 | $1.00 | Yes |
| Minnesota | AWP-14% | $3.65 | none | Yes |
| Mississippi | AWP-12% | $3.91 | $1.00 (generic); $2.00 (brand) | No |
| Missouri | Lower of AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00* | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY | STATE MAC |
|---|---|---|---|---|
| New Hampshire | AWP-12% | $2.50 | $.50 (generic); $1.00 (brand) | Yes |
| New Jersey | AWP-10% | $3.73; $4.07 (add'l services) | none | No |
| New Mexico | AWP-12.5% | $3.65 | none | Yes |
| New York | AWP-10% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $2.00 (brand) | No |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| North Dakota | AWP-10% | $5.10 | $3.00 (brand) | No |
| Ohio | Lower of WAC+9% or AWP-12.8% | $3.70 | none | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00* | Yes |
| Oregon | AWP-11% (institutional), AWP-15% (noninstitutional) | $3.50 (retail); $3.91 (institutional) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | | No |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | $1.00 | No |
| South Carolina | AWP-10% | $4.05 (independ pharm): $3.15 (institutional) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($5.55 for unit dose) | $2.00 | Yes |
| Tennessee | AWP-13% | $2.50 (long term care dual eligib); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | AWP-15% or WAC+12% (whichever is lowest) | $5.27 | N/A | Yes |
| Utah | AWP-15% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00* | Yes |
| Virginia | AWP-10.25% | $4.25 | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (1-4 manufact)), AWP-50% (multiple source 5+), AWP-19% (brand-mail order), AWP-15% (generic-mail order) | $4.20-$5.20 (based on 3-tiered pharmacy volume); $3.25 (mail order) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$3.00* | No |
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $1.00 (legend) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, NH=nursing home)
*Variation in co-pay amounts is due to the cost of the prescription.
SOURCE:  CMS Approved State Plans

REVISED 10/15/03

# Medicaid Prescription Reimbursement Information by State - Qtr Ending June 2003

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY* | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% (1st), AWP-10% (2nd) | $5.40 | $.50-$3.00 | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | AWP-15% +$2.00 (FFS only) | none | none | No |
| Arkansas | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00 | Yes |
| California | AWP-5% | $4.05 | $1.00 | Yes |
| Colorado | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharm); $1.89 (institut pharm) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-40% (generic); AWP-12% | $3.60 | $1.00 | Yes |
| Delaware | AWP-14% (traditional); AWP-16% (non-traditional) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | AWP-13.25%, WAC+7%, FUL, SMAC or Amount Billed (whichever is lowest) | $4.23; $4.73 (NH-long term care) | none | Yes |
| Georgia | AWP-10% | $4.63 (for profit pharm); $4.33 (not for profit); $.50 (generic incentive) | $.50 (generic); $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | AWP-25% (generic); AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $.50-$3.00 | Yes |
| Iowa | AWP-10% | $5.17 | $1.00 | Yes |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisiana | AWP-13.5% (AWP-15% for chains) | $5.77 | $.50-$3.00 | Yes |
| Maine | AWP-13% | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $.50-$3.00 | Yes |
| Maryland | AWP-10% or WAC+10%, direct price+10% or distributor price when available | $4.69 (generic); $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25 (home IV therapy) | $2.00 | Yes |
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $2.00 | Yes |
| Michigan | AWP-13.5% (1-4 stores), AWP-15.1% (5+ stores) | $3.77 | $1.00 | Yes |
| Minnesota | AWP-14% | $3.65 | none | Yes |
| Mississippi | AWP-12% | $3.91 | $1.00 (generic); $3.00 (brand) | No |
| Missouri | AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00 | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY* | STATE MAC |
|---|---|---|---|---|
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |
| New Hampshire | AWP-12% | $2.50 | $.50 (generic); $1.00 (brand) | Yes |
| New Jersey | AWP-10% | $3.73; $4.07 (add'l services) | none | No |
| New Mexico | AWP-12.5% | $3.65 | none | Yes |
| New York | AWP-10% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $2.00 (brand) | No |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| North Dakota | AWP-10% | $5.10 | $3.00 (brand) | No |
| Ohio | WAC+9% or AWP-12.8% | $3.70 | none | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00 | Yes |
| Oregon | AWP-11% (institut), AWP-15% (noninstitut) | $3.50 (retail); $3.91 (institut) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | $1.00 | No |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | none | No |
| South Carolina | AWP-10% | $4.05 (independ pharm); $3.15 (institut) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($5.55 for unit dose) | $2.00 | Yes |
| Tennessee | AWP-13% | $2.50 (long term care dual eligib); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | AWP-15% or WAC+12% (whichever is lowest) | $5.27 | N/A | Yes |
| Utah | AWP-15% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00 | Yes |
| Virginia | AWP-10.25% | $4.25 | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (1-4 manufact)), AWP-50% (multiple source 5+), AWP-19% (brand-mail order), AWP-15% (generic-mail order) | $4.20-$5.20 (based on 3-tiered pharmacy volume); $3.25 (mail order) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$2.00 | No |
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $1.00 (per legend) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, N/A=not available, NH=nursing home)
*Variation in co-pay amounts is due to the cost of the prescription.                REVISED 7/3/03
SOURCE: CMS Approved State Plan

# Medicaid Prescription Reimbursement Information by State
## As of May 22, 2003

Revised 5/22/2003

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY* | STATE MAC |
|---|---|---|---|---|
| Alabama | WAC +9.2% (1st); AWP-10% (2nd) | $5.40 | $.50-$3.00 | Yes |
| Alaska | AWP-5% | $3.45-$11.46 (based on pharmacy/Medicaid volume) | $2.00 | No |
| Arizona | AWP-15% +$2.00 (FFS only) | none | none | No |
| Arkansas | AWP-20% (generic); AWP-14% (brand) | $5.51 | $.50-$3.00 | Yes |
| California | AWP-5% | $4.05 | $1.00 | Yes |
| Colorado | AWP-35% (generic); AWP-13.5% (brand) | $4.00 (retail pharm); $1.89 (institut pharm) | $.75 (generic); $3.00 (brand) | Yes |
| Connecticut | AWP-12% | $3.60 | $1.00 | No |
| Delaware | AWP-14% (traditional); AWP-16% (non-traditional) | $3.65 | none | Yes |
| DC | AWP-10% | $4.50 | $1.00 | No |
| Florida | AWP-13.25%, WAC+7%, FUL, SMAC or Amount Billed (whichever is lowest) | $4.23; $4.73 (NH-long term care) | none | Yes |
| Georgia | AWP-10% | $4.63 (for profit pharm); $4.33 (not for profit); $.50 (generic incentive) | $.50 (generic); $.50-$3.00*(brand); $.50 (preferred brand) | Yes |
| Hawaii | AWP-10.5% | $4.67 | none | Yes |
| Idaho | AWP-12% | $4.94 ($5.54 for unit dose) | none | Yes |
| Illinois | AWP-25% (generic); AWP-12% (brand) | $4.60 (generic); $3.40 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| Indiana | AWP-20% (generic); AWP-13.5% (brand) | $4.90 | $.50-$3.00 | Yes |
| Iowa | AWP-10% | $5.17 | $1.00 | No |
| Kansas | AWP-27% (generic); AWP-13% (single source) | $3.40 | $3.00 | Yes |
| Kentucky | AWP-12% | $4.51 | $1.00 | Yes |
| Louisiana | AWP-13.5% (AWP-15% for chains) | $5.77 | $.50-$3.00 | Yes |
| Maine | AWP-13% | $3.35; $4.35 & $5.35 (compounding); $12.50 (insulin syringe) | $.50-$3.00 | Yes |
| Maryland | AWP-10% or WAC+10%, direct price+10% or distributor price when available | $4.69 (generic); $3.69 (brand); $5.65 (generic-NH); $4.65 (brand-NH); $7.25 (home IV therapy) | $2.00 | Yes |
| Massachusetts | WAC+6% | $3.50 (single source), $5 (multiple source) | $0.50 | Yes |
| Michigan | AWP-13.5% (1-4 stores); AWP-15.1% (5+ stores) | $3.77 | $1.00 | Yes |
| Minnesota | AWP-14% | $3.65 | none | Yes |

(AWP=avg wholesale price, WAC=wholesaler acquisition cost, N/A=not available, NH=nursing home)
*Variation in co-pay amounts is due to the cost of the prescription.
SOURCE: CMS Approved State Plan

# Medicaid Prescription Reimbursement Information by State

## As of May 22, 2003

Revised 5/22/2003

| STATE | INGREDIENT COST | DISPENSING FEE | CO-PAY* | STATE MAC |
|---|---|---|---|---|
| Mississippi | AWP-12% | $3.91 | $1.00 (generic); $3.00 (brand) | No |
| Missouri | AWP-10.43% or WAC+10% | $4.09 | $.50-$2.00 | Yes |
| Montana | AWP-15% | $4.70 | $1.00 | No |
| Nebraska | AWP-11% | $3.27-$5.00 (based on service delivery, unit dosage or 3rd party payors) | $2.00 | Yes |
| Nevada | AWP-15% | $4.76 | $1.00 (generic); $2.00 (brand) | No |
| New Hampshire | AWP-12% | $2.50 | $.50 (generic); $1.00 (brand) | Yes |
| New Jersey | AWP-10% | $3.73; $4.07 (addt'l services) | none | No |
| New Mexico | AWP-12.5% | $3.65 | none | Yes |
| New York | AWP-10% | $4.50 (generic); $3.50 (brand) | $.50 (generic); $2.00 (brand) | No |
| North Carolina | AWP-10% | $5.60 (generic); $4.00 (brand) | $1.00 (generic); $3.00 (brand) | Yes |
| North Dakota | AWP-10% | $4.60 | $3.00 (brand) | No |
| Ohio | WAC+9% or AWP-12.8% | $3.70 | none | Yes |
| Oklahoma | AWP-12% | $4.15 | $1.00-$2.00 | Yes |
| Oregon | AWP-11% (institut), AWP-15% (noninstitut) | $3.50 (retail); $3.91 (institut) | $2.00 (generic); $3.00 (brand) | Yes |
| Pennsylvania | AWP-10% | $4.00 | $1.00 | Yes |
| Rhode Island | WAC+5% | $3.40 (outpatient), $2.85 (long term care) | none | No |
| South Carolina | AWP-10% | $4.05 (independ pharm); $3.15 (institut) | $3.00 | Yes |
| South Dakota | AWP-10.5% | $4.75 ($3.55 for unit dose) | $2.00 | No |
| Tennessee | AWP-13% | $2.50 (long term care dual eligib); $5.00 (NH only-if 28 days+) | N/A | Yes |
| Texas | AWP-15% or WAC+12% (whichever is lowest) | $5.27 | N/A | Yes |
| Utah | AWP-12% | $3.90 (urban); $4.40 (rural) | $3.00 | Yes |
| Vermont | AWP-11.9% | $4.25 | $1.00-$3.00 | Yes |
| Virginia | AWP-10.25% | $4.25 | $1.00 | Yes |
| Washington | AWP-14% (single source & multiple source (1-4 manufact)). AWP-50% (multiple source 5+) | $4.20-$5.20 (based on 3-tiered pharmacy volume) | none | Yes |
| West Virginia | AWP-12% | $3.90 (+$1.00 for compounding) | $.50-$2.00 | No |
| Wisconsin | AWP-11.25% | $4.88 | $.50 (over-the-counter); $1.00 (per legend) | Yes |
| Wyoming | AWP-11% | $5.00 | $2.00 | No |

(AWP=avg wholesale price. WAC=wholesaler acquisition cost, N/A=not available, NH=nursing home)
*Variation in co-pay amounts is due to the cost of the prescription.
SOURCE: CMS Approved State Plan

DRUG REIMBURSEMENT INFORMATION

# MEDICAID REIMBURSEMENT FOR DRUGS BY STATE

This table shows Medicaid prescription drug reimbursement rates and related information for 1999 as reported by the state drug program administrators in the annual National Pharmaceutical Council Survey.

| State | Dispensing fees | Co-pay | Ingredient reimbursement basis |
|---|---|---|---|
| Alabama | $5.40 | $0.50 - $3.00 | WAC+9.2% |
| Alaska | $3.45 - $11.46 | $2.00 | AWP-5% |
| Arizona* † | — | — | AWP-10% |
| Arkansas | $5.51 | $0.50 - $3.00 | AWP-10.5% |
| California | $4.05 | G: $1.00, B: $1.00 | AWP-5% |
| Colorado | $4.08 | G: $0.50, B: $2.00 | AWP-10%; WAC+18% |
| Connecticut | $4.10 | No | AWP-12% |
| Delaware | $3.65 | No | AWP-12.9% |
| District of Columbia† | $3.75 | $1.00 | AWP-10% |
| Florida | $4.23 | No | AWP-11.5%, WAC+7% |
| Georgia | $4.63 | $0.50 | AWP-10% |
| Hawaii | $4.67 | No | AWP-10.5% |
| Idaho | $4.94 | No | AWP-11% |
| Illinois | $3.69 - $15.45 | No | AWP-10%; AWP-12% (multi-source drugs) |
| Indiana | $4.00 | $0.50 - $3.00 | AWP-10% |
| Iowa | $4.10 - $6.38 | $1.00 | AWP-10% |
| Kansas | $4.94 | $2.00 | AWP-10% |
| Kentucky | $4.75 OP/$5.75 LTC | No | AWP-10% |
| Louisiana | $5.77 | $0.50 - $3.00 | AWP-10.5% |
| Maine | $3.35 - $5.35 | $0.50 - $3.00 | AWP-10% |
| Maryland | $4.21 | $1.00 | AWP-10% |
| Massachusetts | $3.00 | $0.50 | WAC+10% |
| Michigan | $3.72 | $1.00 | AWP-13.5% or AWP-15.1% |
| Minnesota | $3.65 | No | AWP-9% |
| Mississippi | $4.91 | $1.00 | AWP-10% |
| Missouri | $4.09 | $0.50 - $2.00 | AWP-10.43% |
| Montana | $2.00 - $4.20 | G: $1.00, B: $2.00 | AWP-10% |
| Nebraska | $2.85 - $5.05 | $1.00 | AWP-8.71% |
| Nevada | $4.76 | No | AWP-10% |
| New Hampshire | $2.50 | G: $0.50, B: $1.00 | AWP-12% |
| New Jersey | $3.73 - $4.07 | No | AWP-10% |
| New Mexico | $4.00 | No | AWP-12.5% |
| New York | $3.50 - $4.50 | G: $0.50, B: $2.00 | AWP-10% |
| North Carolina | $5.60 | $1.00 | AWP-10% |
| North Dakota | $4.60 | No | AWP-10% |
| Ohio | $3.70 | No | AWP-11% |
| Oklahoma | $4.15 | $1.00 - $2.00 | AWP-10.5% |
| Oregon | $3.80 - $4.16 | No | AWP-11% |
| Pennsylvania | $4.00 | $1.00 - $2.00 | AWP-10% |
| Rhode Island† | $2.85 - $3.40 | No | WAC+5% |
| South Carolina | $4.05 | $2.00 | AWP-13% |
| South Dakota | $4.75 - $5.55 | $2.00 | AWP-10.5% |
| Tennessee* † | — | — | — |
| Texas | $5.27 + 2% | No | AWP-15%; WAC+12% |
| Utah† | $3.90 - $4.40 | $1.00 | AWP-12% |
| Vermont | $4.25 | $1.00 - $2.00 | AWP-10% |
| Virginia | $4.25 | $1.00 | AWP-9% |
| Washington | $3.98 - $4.92 | No | AWP-11% |
| West Virginia | $3.90 - $4.90 | $0.50 - $2.00 | AWP-12% |
| Wisconsin | $4.88 to $40.11 | $0.50 - $1.00 | AWP-10% |
| Wyoming | $4.70 | $2.00 | AWP-4% |

OP = Outpatient; LTC = Long Term Care; WAC = Wholesalers Acquisition Cost;
AWP = Average Wholesale Price; G = Generic; B = Brand Name.

*Within federal and state guidelines, individual managed care and pharmacy
benefit management organizations make formulary/drug decisions.

†These states did not submit information for this table, so their 1998 data are
included.

Source: National Pharmaceutical Council, Reston, Va.

DRUG REIMBURSEMENT INFORMATION                                                                    93

# MEDICAID REIMBURSEMENT FOR DRUGS BY STATE

This table shows Medicaid prescription drug reimbursement rates  |  administrators in the annual National Pharmaceutical Council
and related information as reported by the state drug program  |  Survey.

| State | Dispensing Fees | Ingredient Reimbursement Basis | Co-pay | Year |
|---|---|---|---|---|
| Alabama | $5.40 | AWP-10%; WAC+9.2% | $0.50 - $3.00 | 2000 |
| Alaska | $3.45 | AWP-5% | $2.00 | 2000 |
| Arizona* | - | AWP-10% | - | 1999 |
| Arkansas | $5.51 | AWP-10.5% | $0.50 - $3.00 | 2000 |
| California | $4.05 | AWP-5% | G: $1.00, B: $1.00 | 2000 |
| Colorado | $4.08 | AWP-10% or WAC+18%, whichever is lowest | G: $0.50, B: $2.00 | 2000 |
| Connecticut | $4.10 | AWP-12% | No | 2000 |
| Delaware | $3.65 | AWP-12.9% | No | 2000 |
| District of Columbia | $3.75 | AWP-10% | $1.00 | 1999 |
| Florida | $4.23 | AWP-13.25%— | No | 2000 |
| Georgia | $4.63 | AWP-10% | $0.50 | 2000 |
| Hawaii | $4.67 | AWP-10.5% | No | 2000 |
| Idaho | $4.94 ($5.54 for unit dose) | AWP-11% | No | 2000 |
| Illinois | G: $3.75, B: $3.45 | AWP-10%, AWP-12% for multi-source drugs | No | 2000 |
| Indiana | $4.00 | AWP-10% | $0.50 - $3.00 | 2000 |
| Iowa | $4.13 - $6.42 | AWP-10% | $1.00 | 2000 |
| Kansas | $4.50 | AWP-10% | $2.00 | 2000 |
| Kentucky | OP: $4.75, LTC: $5.75 | AWP-10% | No | 2000 |
| Louisiana | $5.77 | AWP-10.5% | $0.50 - $3.00 | 1999 |
| Maine | $3.35 (+ extra fees for compounding) | AWP-10% | $0.50 - $3.00 | 1999 |
| Maryland | $4.21 | Lowest of: WAC+10%, direct+10%, AWP-10% | $1.00 | 2000 |
| Massachusetts | $3.00 | WAC+10% | $0.50 | 2000 |
| Michigan | $3.72 | AWP-13.5% (1 to 4 stores), AWP-15.1% (5+ stores) | $1.00 | 2000 |
| Minnesota | $3.65 | AWP-9% | No | 2000 |
| Mississippi | $4.91 | AWP-10% | $1.00 | 2000 |
| Missouri | $4.09 | AWP-10.43% | $0.50 - $2.00 | 2000 |
| Montana | $2.00 - $4.20 | AWP-10% | G: $1.00, B: $2.00 | 2000 |
| Nebraska | $3.20 - $5.05 | AWP-8.71% | $1.00 | 2000 |
| Nevada | $4.76 | AWP-10% | No | 2000 |
| New Hampshire | $2.50 | AWP-12% | G: $0.50, B: $1.00 | 2000 |
| New Jersey | $3.73 - $4.07 | AWP-10% | No | 2000 |
| New Mexico | $4.00 | AWP-12.5% | No | 1999 |
| New York | B: $3.50 G: $4.50 | AWP-10% | G: $0.50, B: $2.00 | 2000 |
| North Carolina | $5.60 | AWP-10% | $1.00 | 2000 |
| North Dakota | $4.60 | AWP-10% | No | 1999 |
| Ohio | $3.70 | AWP-11% | No | 2000 |
| Oklahoma | $4.15 | AWP-10.5% | $1.00 - $2.00 | 2000 |
| Oregon | $3.91 - $4.28 (based on annual # of Rxs) | AWP-11% | No | 2000 |
| Pennsylvania | $4.00 | AWP-10% | $1.00 - $2.00 | 2000 |
| Rhode Island | OP: $3.40, LTC: $2.85 | WAC+5% | No | 1999 |
| South Carolina | $4.05 | AWP-10% | $2.00 | 2000 |
| South Dakota | $4.75 ($5.55 for unit dose) | AWP-10.5% | $2.00 | 2000 |
| Tennessee* | - | - | No | 1999 |
| Texas | $5.27 + 2% of ingredient & dispensing fee | AWP-15% or WAC+12%, whichever is lowest | No | 2000 |
| Utah | $3.90 - $4.40 (based on geographic area) | AWP-12% | $1.00 - $5.00 | 1999 |
| Vermont | $4.25 | AWP-11.9% | $1.00 - $2.00 | 2000 |
| Virginia | $4.25 | AWP-9% | $1.00 | 1999 |
| Washington | $4.06 - $5.02 (based on annual # of Rxs) | AWP-11% | No | 2000 |
| West Virginia | $3.90 (+ extra fees for compounding) | AWP-12% | $0.50 - $2.00 | 2000 |
| Wisconsin | $4.88 | AWP-10% | $0.50 - $1.00 | 2000 |
| Wyoming | $4.70 | AWP-4% | $2.00 | 2000 |

AWP = average wholesale price; B = brand name;
G = generic; LTC = long-term care;
OP = outpatient; WAC = wholesaler's acquisition cost

*Within federal and state guidelines, individual managed care and pharmacy
benefit management organizations make formulary/drug decisions

Source: National Pharmaceutical Council, Reston, Va.

112                                                                                          2002 RED BOOK

# MEDICAID REIMBURSEMENT FOR DRUGS BY STATE

This table shows Medicaid prescription drug reimbursement rates, state drug program administrators, to the National Association of and related information as of December 4, 2001, as reported by Chain Drug Stores.

| State | Fees | Co-pay |
|---|---|---|
| Alabama | AWP - 10%; WAC + 9.2% + $5.40 | $0.50 - $3.00 |
| Alaska | AWP - 5% + $3.45 | $2.00 |
| Arizona | Entire program in managed care | No |
| Arkansas | AWP - 10.5% + $5.51 | $0.50 - $3.00 |
| California | AWP - 5% + $4.05 | $1.00 |
| Colorado | AWP - 11% + $4.00 | $0.50/$2.00 |
| Connecticut | AWP - 12% + $4.10 | No |
| Delaware | AWP - 12.9% + $3.65 | No |
| District of Columbia | AWP - 10% + $3.75 | $1.00 |
| Florida | AWP - 13.25% + $4.73 (formulary)/$3.73 (non-formulary) | No |
| Georgia | AWP - 10% + $4.63 (MFN) | $0.50 generic and preferred brand/$0.50 -$3.00 non-preferred brand |
| Hawaii | AWP - 10.5% + $4.67 | No |
| Idaho | AWP - 12% + $4.94 | No |
| Illinois | AWP - 20% + $5.10 (generics); AWP - 11% + $4.00 (brands) | No |
| Indiana | AWP - 10% + $4.00 | $0.50 - $3.00 |
| Iowa | AWP - 10% + $5.17 | $1.00 |
| Kansas | AWP - 10% + $4.50 | $2.00 |
| Kentucky | AWP - 10% + $4.51 | No |
| Louisiana | AWP - 13.5%/15% + $5.77 | $0.50 - $3.00 |
| Maine | EAC/AWP - 10% + ($3.10 - $5.10) (MFN) | $0.50 - $3.00 |
| Maryland | WAC + 10% + $4.21 | $1.00 |
| Massachusetts | AWP + 10% + $3.00 (MFN) | $0.50 |
| Michigan | AWP - 13.5% (independent)/15.1% (chain) + $3.77 | $0.50 - $3.00 (reverts to $1.00 if uncollectable) |
| Minnesota | AWP - 9% + $3.65; $8/bag for IV solutions; $14/bag for cancer therapy products; $30/bag for parenteral nutritional products (1 liter); $44/bag for parenteral nutritional products (>1 liter) | No |
| Mississippi | AWP - 10% + $4.91 | $1.00 |
| Missouri | AWP - 10.43% + $4.09 | $0.50 - $2.00 |
| Montana | AWP - 10% + ($2.00 - $4.20), based on dispensing fee questionnaire | $1.00/$2.00 |
| Nebraska | AWP - 8.71% + ($3.20 - $5.05) | $1.00 |
| Nevada | AWP - 10% + $4.76 | No |
| New Hampshire | AWP - 12% + $2.50 | $0.50/$1.00 |
| New Jersey | AWP - 13% + $3.50 | No |
| New Mexico | AWP - 12.5% + $4.00 | No |
| New York | AWP - 10% + $3.50/$4.50 | $0.50/$2.00 |
| North Carolina | AWP - 10% + $4.30 (brands); AWP - 10% + $5.60 (generics) | Brands: $3.00; Generics: $1.00 |
| North Dakota | AWP - 10% + $4.60 | No |
| Ohio | AWP - 11.2% + $3.70 | No |
| Oklahoma | AWP - 10.5% + $4.15 | $1.00/$2.00 |
| Oregon | AWP - 13% + $3.50 ($3.80 for nursing homes) | No |
| Pennsylvania | AWP - 10% + $4.00 | $1.00 |
| Rhode Island | WAC + 5% + $3.40 | No |
| South Carolina | AWP - 10% + $2.00 | $3.00 |
| South Dakota | AWP - 10% + $4.75 | $2.00 |
| Tennessee | AWP - 13% + $2.50 | $5.00/$10.00 (income-dependent) |
| Texas | AWP - 15% (independent); AWP - 18% (chains and warehouses); WAC + 12% + ($5.27 + 2% + $0.15 delivery fee) | No |
| Utah | AWP - 12% + $3.90 (urban providers)/$4.40 (rural providers) | $1.00, with $5.00 maximum per month |
| Vermont | AWP - 11.9% + $4.25 | $1.00 - $3.00 |
| Virginia | AWP - 9% + $4.25 | Brands: $2.00; Generics: $1.00 |
| Washington | AWP - 11% + ($4.06 - $5.06) | No |
| West Virginia | AWP - 12% + $3.90 | $0.50 - $2.00 |
| Wisconsin | AWP - 11.25% + $4.38 | $1.00 |
| Wyoming | AWP - 11% + $5.00 | $1.00 |

AWP = average wholesale price; EAC = estimated acquisition cost; MFN = most favored nations reimbursement; WAC = wholesaler's acquisition cost.

Source: National Association of Chain Drug Stores, Alexandria, Va.; December 4, 2001.

DRUG REIMBURSEMENT INFORMATION 113

# MEDICAID REIMBURSEMENT FOR DRUGS BY STATE

This table shows Medicaid prescription drug reimbursement rates, state drug program administrators to the National Association and related information as of December 3, 2002, as reported by I. Chain Drug Stores.

| State | Medicaid Formula | Co-pay |
|---|---|---|
| Alabama | AWP - 10% or WAC + 9.2% + $5.40 (brands and generics) | $0.50 - $3.00 |
| Alaska | AWP - 5% + $3.45 | $2.00 |
| Arizona | Entire program in managed care | |
| Arkansas | AWP - 14% brands / AWP - 20% generics + $5.51 + $2.00 generic incentive | $0.50 to $3.00 |
| California | AWP - 5% + $3.55 | $1.00 |
| Colorado | AWP - 13.5% (brand) and AWP - 35% (generic) | $0.75 / $3.00 |
| Connecticut | AWP - 12% + $3.85 | None |
| Delaware | Generics: AWP - 58% Brands: AWP - 16.32% (traditional pharmacies: AWP - 24.32%) | None |
| District of Columbia | AWP - 10% + $3.75 | $1.00 |
| Florida | Lower of WAC + 7% or AWP - 13.25% + $4.73 (formulary) / $3.73 (nonformulary) | None |
| Georgia | AWP - 10% (MFN) + $4.63 (brand) / $5.13 (generic ) | Generics and preferred brands: $0.50; Nonpreferred brands: $0.50 - $3.00 |
| Hawaii | AWP - 10.5% + $4.67 | None |
| Idaho | AWP - 12% + $4.94 | None |
| Illinois | Brand: AWP - 12% + $3.40; generic AWP - 25% + $4.60 | Brands: $3.00; Generics: $1.00 |
| Indiana | AWP - 13.5% + $4.90 (brand) / AWP - 20% + $4.90 (generic) | Generic legend drugs, all nonlegend drugs, and compounded prescriptions: $0.50; Brands: $3.00 |
| Iowa | AWP - 10% + $5.17 | $1.00 |
| Kansas | AWP - 10% + $4.50 | $3.00 |
| Kentucky | AWP - 12% + $4.51 | $1.00 |
| Louisiana | AWP - 13.5% (independent) / AWP - 15% (chain) + $5.77 | $0.50 - $3.00 |
| Maine | EAC / AWP - 13% + $3.35 (MFN) | $0.50 - $3.00, $10.00 for HIV drugs |
| Maryland | Lower of (WAC + 10%) or (AWP - 10%) + $4.21 | Brands only: $2.00 |
| Massachusetts | WAC + 6% (MFN) + $3.50 (brand) / $5.00 (generic) | $2.00 |
| Michigan | AWP - 13.5% (independent / 15.1% (chain) + $3.77 | $0.50 - $3.00 (reverts to $1.00 if uncollectable) |
| Minnesota | AWP - 9% + $3.65; $8 / bag for IV solutions; $14 / bag for cancer therapy products; $30 / bag for parenteral nutritional products (1 liter); $44 / bag for parenteral nutritional products ( >1 liter) | None |
| Mississippi | AWP - 12% + $3.91 | $3.00 |
| Missouri | AWP - 10.43% + $4.09 | $0.50 - $2.00 |
| Montana | AWP - 15% + $4.70 | $1.00 minimum; 5% coinsurance |
| Nebraska | AWP - 11% + ($3.20 to $5.05) | $2.00 |
| Nevada | AWP - 15% + $4.76 | None |
| New Hampshire | AWP - 12% (MFN) + $2.50 | $0.50/$1.00 |
| New Jersey | AWP - 10% + ($3.73 to $4.07) | None |
| New Mexico | AWP - 12.5% + $3.65 | None |
| New York | AWP - 10% + $3.50 / $4.50 | Brands: $2.00; Generics & OTCs: $0.50 ($100/yr. limit) |
| North Carolina | AWP - 10% + $4.00 (brand); AWP - 10% + $5.60 (generic) | Brands: $3.00; Generics: $1.00 |
| North Dakota | AWP - 10% + $4.60 | $3.00 |
| Ohio | WAC + 9% (or AWP - 12.8% if WAC unknown) + $3.70 | $1.00 |
| Oklahoma | AWP - 12% + $4.15 | $1.00 / $2.00 |
| Oregon | AWP - 14% + $3.50 ($3.80 for nursing homes) | Brands: $3.00; Generics: $2.00 (pending as of 12/02) |
| Pennsylvania | AWP - 10% + $4.00 | $1.00 |
| Rhode Island | WAC + 5% + $3.40 | None |
| South Carolina | AWP - 10% + $4.05 | $3.00 |
| South Dakota | AWP - 10.5% + $4.75 | $2.00 |
| Tennessee | AWP - 13% + $2.50 | $1.00 / $1.00 / $3.00 (TennCare Medicaid); $1.00 / $3.00 / $5.00 (TennCare Standard Below Poverty); $5.00 / $15.00 / $25.00 TennCare Standard Above Poverty) |
| Texas | (AWP - 15%) / (WAC + 12%) + ($5.27 + 2% + $0.15 delivery fee) Chain pharmacy is reimbursed at warehouse rate of AWP - 18% | None (brands: $3.00; generics: $0.50 pending as of 12/02) |
| Utah | AWP - 12% + $3.90 (urban providers) / + $4.40 (rural) | $1.00, with $5.00 maximim per month; nontraditional: $2.00 |
| Vermont | AWP - 11.9% + $4.25 | Brands: $6.00; Generics: $3.00 (CMS approval pending) |
| Virginia | AWP - 10.25% + $4.25 | Brands: $2.00; Generics: $1.00 |
| Washington | AWP - 14% (brand) (fewer than live manufacturers); AWP - 50% (generic) (five or more manufacturers) | None |
| West Virginia | AWP - 12% + $3.90 | $0.50 for drugs with allowed charge of $10.00 or less; $1.00 for drugs with allowed charge of $10.01 to $25.00; $2.00 for drugs with allowed charge of $25.01 or more |
| Wisconsin | AWP - 11.25% + $4.38 | $0.50 for OTCs, no limit; $1.00 for legend drugs, up to $5.00 per month maximum |
| Wyoming | AWP - 11% + $5.00 | $2.00 |

AWP = average wholesale price; EAC = estimated acquisition cost; MFN = most favored nations reimbursement; WAC = wholesaler's acquisition cost.

EXHIBIT "4"

Point-of-Care Knowledge Bases

First DataBank

# New Product Submission Form

For your convenience, you may use this form to add products to the National
Drug Data File (NDDF). Please make copies of this form for each add.

| | |
|---|---|
| NDC Number | |
| UPC Number | |
| Product Name | |
| RX or OTC | |
| Package Size (ml, gm, each) | |
| Dosage Form (tablet, capsule, powder filled vial, ampul, ointment, etc...) | |
| Wholesale (Distributor) Price | |
| Direct Price | |
| AWP Price | |
| Effective Date (start ship date) | |
| Active Ingredients & strengths (Package Insert and Label are preferred.) | |

Company Name: _____

Your Name: _____

Telephone: _____

The Hearst Corporation, 1111 Bayhill Drive, San Bruno, California 94056 Tel: (415)588-5454 Fax: (425)588-6867

EXHIBIT "5"

SENT BY: VENACARE;                    3052921739;        JAN  '2 7:25PM;        PAGE 3

TO: W33                         AT: 13055776545



## Texas Department of Health

*http://www.tdh.state.tx.us*

1100 West 49th Street
Austin, Texas 78756-3199
(512) 458-7111

William R. Archer III, M.D.
Commissioner of Health

Paul J. Patterson, M.D., M.P.H.
Executive Deputy Commissioner

Under the Omnibus Budget Reconciliation Act (OBRA) of 1990, the state of Texas Vendor Drug Program will continue to request completed questionnaire as a requirement for the production addition to the Texas Vendor Drug Index (TVDI). A form is included so that all necessary information from the manufacturer will be available for pricing and dosing recommendations. Questionnaires should be limited to no more than 20 per submittal request for any one month period. A separate questionnaire is to be submitted for each drug and strength. <u>Please supply a cover sheet listing all products, strengths and package sizes for which you are submitting applications.</u> Questions must be answered in full (NO – N/A). This form may be reproduced.

All inquiries regarding this questionnaire for BVD and revisions are to be directed to:

Texas Department of Health
Bureau Vendor Drug
1100 West 49th Street.
Austin, Texas 78756-3174

Drugs are listed in the BVD using the NDC number of the manufacturer or distributor who is holding the drug forth as his own and has his company's name on the label of the container that is sold to the pharmacy. If your company has a product to which the "New Drug Coverage" applies, please add the FDA approval date of the New Drug Application (NDA), Product License Approval (PLA), Establishment License Approval (ELA), or Antibiotic Drug Approval (ADA) to the questionnaire.

Martha McNeill, R.Ph.
Director of Product Management
Bureau of Vendor Drug
(512)338-6965
(512)338-6462-Fax
(512)338-6932-Secretary

## REQUEST FOR INFORMATION FOR NEW DRUG PRODUCT OR FOR ADDITIONAL INFORMATION OF PRODUCTS CURRENTLY INCLUDED IN TEXAS MEDICAID

### Please fill out the following information for consideration on Texas Medicaid

CLUDE A COPY OF FILE CARD, PACKAGE INSERT AND OR MATERIAL FOR PHYSICIANS

### DRUG DESCRIPTION

| DC. NO: | PACKAGE QTY: | |
|---|---|---|
| nultiple package size of same strength | products may be included) | |
| RODUCT BRAND NAME: | | |
| ENERIC NAME: | | |
| *STRUCTURALLY RELATED DRUGS: | | |
| RUG STRENGTH: | | |
| OLOR: | FLAVOR: | ORANGE BOOK RATING: |
| OSAGE FORM: | IS THIS DRUG LEGEND OR OTC? | DEA SCHEDULE OF THE DRUG: |
| 1AXIMUM DAILY DOSE: | | |
| ECOMMENDED DAILY DOSE: | | |
| NGREDIENTS/DESCRIPTION: | | |
| *LIST SHELF LIFE: | | |
| *ESTIMATED AVG. DURATION OF THERAPY: | | |
| 'MAXIMUM DURATION OF TREATMENT: | | |

A - Drug products that FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products.

B - Drug products that FDA at this time, considers not to be therapeutically equivalent to other pharmaceutically equivalent products.

C - Not listed in Orange Book

** NEW ADDITIONAL INFORMATION - revised (April 1, 1998)

SENT BY: VENACARE;                    3052921739;          JAN   '?  7:25PM;        PAGE 5

**TTACH COPIES OF PRICE LIST & ADD TO MAILING LIST IF NOT CURRENTLY LISTED**

## PRICE INFORMATION

| | |
|---|---|
| /ERAGE OF SUGGESTED WHOLESALE PRICE TO PHARMACY (AWP) | $ |
| ICE TO WHOLESALER AND/OR DISTRIBUTOR | $ |
| RECT PRICE TO PHARMACY | $ |
| ICE TO CHAIN WAREHOUSE | $ |
| INSTITUTIONAL OR OTHER CONTRACT PRICE** (Nursing Home, Home Health Care) | $ |
| THER PRICE | $ |

ie set of price lists is sufficient for multiple submittals.
.otes: If prices vary by specific contract or customer arrangement, you may provide a price range.**

Please circle the companies to whom you report pricing information.

ST DATA BANK PRICE ALERT                    RED BOOK

DI-SPAN                                      BLUE BOOK

HER: _____

Do you sell to distributors, repackagers, or relablers, other than full-service drug wholesalers,    who in turn
sell your product to the retail trade bearing your NDC number?

If yes, attach a listing.

Attach a copy of your sales agreement with retail pharmacists (contract, policy, etc)

Attach a copy of your Vendor Liability Insurance:

a. Included or

b. Previously submitted or unchanged.  (Do not need to resubmit)

Available date through WHOLESALERS_____

| ame of firm: | | |
|---|---|---|
| _dress: | | |
| ity: | State: | Zip: |

ame and address of Manufacturer of drug:

| ity: | State: | Zip: |
|---|---|---|

'ame and Address of representatives/government affairs persons covering the Texas area; if applicable:

| ity: | State: | Zip: |
|---|---|---|
| hone: | | |

Is this product now marketed under an approved NDA or ANDA?

Submit a copy of the FDA letter of approval of the NDA or ANDA, or, if not applicable, a copy of the FDA 'etter of approval for marketing.

Please circle DESI classification of this product.

2   Non-DESI/IRS: safe and effective

3   DESI/IRS under review

4   LTE DESI/IRS for some indications

5   Non-Covered - LTE DESI/IRS for all indications

6   Non-Covered - LTE DESI/IRS withdrawn form the market

roduct added to the Texas Vendor Drug Program must bear the labeler code, as defined by the FDA, of the
ty, with the exception of a bonafide full-service drug wholesaler, marketing the final sale to the provider.

nufacturers or distributors having one or more of their pharmaceuticals included in the program are responsible
ubmitting notification of any changes pertaining to any of the above information not later than such revisions
scheduled to occur to:

Texas Department of Health
Bureau of Vendor Drug
Attn: Martha McNeill, R.Ph.
Director of Product Management
1100 West 49th Street
Austin, Texas 78756-3174

rtify that the information submitted is correct to the best of my knowledge and that this product is not now in
lation of either Federal or State Law. I also agree to inform the Texas Department of Health, in writing, of any
nges in formulation, product status, price or availability as herein describe, within fifteen (15) days of such
nge.

sponsible Person (Type or Print)                         Signature

dress                                    City            State          Zip

                                                  (        )
mpany Name                                        Telephone

# EXHIBIT "6"

# HAS BEEN COMPLETELY

# REDACTED

EXHIBIT "8"

HAS BEEN COMPLETELY

# REDACTED

COMPOSITE EXHIBIT "7"

HAS BEEN COMPLETELY

# REDACTED

# EXHIBIT "9"
## WAC - page 1

The following tables, organized by drug and NDC number, reflect the 2001 false wholesaler prices in First Data Bank's automated services.  The information in the table under the heading "False Reported WAC" reflects each DEFENDANT'S false representations of price charged to wholesalers for drugs.  The heading "Relator's Cost" reflects the true price that each DEFENDANT charged the Relator for the drug or caused another entity to charge the Relator for the drug.

| | ▉▉▉▉ | |
|---|---|---|
| DRUG STRENGTH & SIZE, NDC#s | ▉▉▉▉▉ <br> FALSE REPORTED WAC | RELATOR'S COST (in or about January 2001) |
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉ | ▉▉▉ | ▉▉▉ |
| ▉▉▉▉ | ▉▉▉ | ▉▉▉ |

1

**EXHIBIT "9"**
**WAC - page 2**

| DRUG STRENGTH & SIZE, NDC#s | ███████ FALSE REPORTED WAC | RELATOR'S COST (in or about January 2001) |
|---|---|---|
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |

| DRUG STRENGTH & SIZE, NDC#s | ███████ FALSE REPORTED WAC | RELATOR'S COST (in or about March 2000) |
|---|---|---|
| ███████ | ████ | ████ |

## EXHIBIT "9"
### WAC - page 3

| DRUG STRENGTH & SIZE, NDC#s | ███████ FALSE REPORTED WAC | RELATOR'S COST (in or about March 2000) |
|---|---|---|
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ███ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | ████ |

3

## EXHIBIT "9"
### WAC - page 4

| ██████████ | | |
|---|---|---|
| DRUG STRENGTH & SIZE, NDC#s | ████████ FALSE REPORTED WAC | RELATOR'S COST (in or about March 2000) |
| ██████████ | ████ | ████ |

| ████████ | | |
|---|---|---|
| DRUG STRENGTH & SIZE, NDC#s | ██████ FALSE REPORTED WAC | RELATOR'S COST (in or about March 2000) |
| ██████ | ████ | ████ |
| ██████ | ████ | ████ |
| ██████ | ████ | ████ |

| DEY | | |
|---|---|---|
| DRUG STRENGTH & SIZE, NDC#s | DEY's REPORTED FALSE WACs | RELATOR'S COST (in or about March 2000) |
| ALBUTEROL INHALATION AEROSOL 17 gm 49502-0303-17 | $5.99 | $2.90 |
| ALBUTEROL INHALATION AEROSOL (refill) 17 gm 49502-0303-27 | $5.74 | $2.99 |

4

**EXHIBIT "9"**
**WAC - page 5**

Pages 5 through 36 of Exhibit "9"

Have Been Completely REDACTED

5

**EXHIBIT "10"**
**WEAC - page 5**

Pages 5 Through 34 of Exhibit "10"

Have Been Completely **REDACTED**

# EXHIBIT "10"
## WEAC - page 1

The false price and cost representations, as they were submitted to the State of Texas are organized in the following charts by "Drug", "NDC Number", Texas Medicaid Payment Amount ("WEAC"/"DEAC"), "Relator's Cost", the "Gross Profit" and the percentage of "Gross Profit." The amount under the heading "Relator's Cost" is the true price that each DEFENDANT charged the Relator for the drug or caused another entity to charge the Relator for the drug. A comparison of the Relator's cost with each DEFENDANT'S price representations shows the falsity of each DEFENDANT'S price representations for the specified drugs. Furthermore, the tables show the impact of each DEFENDANT'S false statements because they show health care providers made a profit for prescribing each DEFENDANT'S drugs. Texas Medicaid, which intended to pay for drugs based upon estimated acquisition costs, never intended to pay the amounts under the heading "Gross Profit."

| DEFENDANT ██████ | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC / DEAC | Relator's Cost (in or about January 2001) | WEAC Provider's Gross Profit $ / DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit % / DEAC Provider's Gross Profit % |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |

## EXHIBIT "10"
### WEAC - page 2

| DEFENDANT ▮▮▮▮▮ | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC / DEAC | Relator's Cost (in or about January 2001) | WEAC Provider's Gross Profit $ / DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit % / DEAC Provider's Gross Profit % |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |

| DEFENDANT ▮▮▮▮▮ | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC / DEAC | Relator's Cost (in or about March 2000) | WEAC Provider's Gross Profit $ / DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit % / DEAC Provider's Gross Profit % |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |

# EXHIBIT "10"
## WEAC - page 3

| DEFENDANT █████ | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC ‾‾‾‾ DEAC | Relator's Cost (in or about March 2000) | WEAC Provider's Gross Profit $ ‾‾‾‾‾ DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit % ‾‾‾‾‾ DEAC Provider's Gross Profit % |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |

**EXHIBIT "10"**
**WEAC - page 4**

| DEFENDANT DEY | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC<br>DEAC | Relator's Cost (In or about March 2000) | WEAC Provider's Gross Profit $<br>DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit %<br>DEAC Provider's Gross Profit % |
| Albuterol 17 gm | 49502-0303-17 | $0.39520/gm<br>$6.71<br>$0.352940/gm<br>$5.99 | $2.90 | $3.81<br>$3.09 | 57%<br>52% |
| Albuterol refill | 49502-0303-27 | $0.378810/gm<br>$6.44<br>$0.338230/gm<br>$5.75 | $2.99 | $3.45<br>$2.76 | 54%<br>48% |

| DEFENDANT ███████ | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC<br>DEAC | Relator's Cost (in or about March 2000) | WEAC Provider's Gross Profit $<br>DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit %<br>DEAC Provider's Gross Profit % |
| ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ |